[No. 45302.   En Banc.   May 24, 1979.]

*In the Matter of the Marriage of* PATRICIA R. VERBIN, *Respondent, and* ARTHUR P. VERBIN, *Appellant.*

*Dale B. Sawyer* and *Sawyer & Foshaug, Inc., P.S.*, for appellant.

*David L. Shorett* and *Chambers, Marston, Hodgins, Shorett, Young & Gillingham,* for respondent.

HOROWITZ, J.—This interstate child custody dispute raises questions regarding the circumstances under which a Washington court must decline jurisdiction in favor of proceedings underway in another state, or must enforce the

custody decree entered in those foreign proceedings. The factor which is unique in this case is that although the final decree of the foreign state was entered before Washington concluded its proceeding, the Washington action was commenced, with substantial involvement by both parties, well before the action in the foreign state began. Under these circumstances, with the overriding importance of the best interests of the children involved in mind, we hold the court below properly refused to decline jurisdiction or enforce the foreign decree, and we affirm the custody order which was entered.

Since we are concerned here not only with the technical issues of jurisdiction but also with the question of the best interests of the children, our statement of the facts must be detailed. Appellant Arthur Verbin and respondent Patricia Verbin were married in March 1967. They had two children—Lisa, born in 1969, and Aimee, born in 1971. The family lived together in Maryland for 5 years prior to October 1976.

In the months preceding that date the Verbins suffered a period of serious marital discord. Although they both sought counseling, they were unable to resolve their difficulties. Mrs. Verbin became extremely anxious, was unable to eat or sleep, and grew very concerned over the effect this discord was having on the children. Following a particularly bitter and divisive quarrel, she decided a separation was necessary. Without telling Mr. Verbin of her intention, she took the children and their belongings and came to Washington to live near her parents, brother, and sister, who reside here.

Mrs. Verbin stayed in contact with Mr. Verbin, believing the children should talk with their father. She was completely surprised, however, when Mr. Verbin came to Washington several weeks later, found the children playing outdoors, and took them back to Maryland without notifying her. This lamentable round of child–snatching was completed about 1 week later when Mrs. Verbin returned to Maryland in an attempt to find both girls and bring

them back to Washington. She found Aimee, her younger daughter, as she left school; she could not find Lisa. Fearing her husband would stop her if she waited any longer, she left without Lisa, bringing Aimee back to Washington with her. Shortly thereafter, on November 18, 1976, Mrs. Verbin commenced an action in Washington seeking dissolution of her marriage and custody of both girls. On the same day the commissioner for the Superior Court for King County entered an immediate restraining order restraining Mr. Verbin from interfering with Mrs. Verbin's custody of Aimee.

Mr. Verbin appeared promptly in the action, making no effort to contest the jurisdiction of the Washington court over his daughter Aimee. His attorney filed a notice of appearance on December 9, 1976, Mr. Verbin filed a financial statement with the court, and at the end of December he appeared through his attorney at a hearing to argue the merits of the temporary restraining order. On December 29, 1976, the court entered a temporary order on show cause continuing the immediate temporary restraining order in effect pending further hearing regarding Aimee's custody. On January 4, 1977, Mr. Verbin filed a lengthy affidavit regarding custody and financial matters.

On January 10, 1977, despite his continuing participation in the Washington dissolution and custody proceedings, Mr. Verbin commenced an action for divorce *a mensa et thoro* in Maryland, seeking permanent custody of both Lisa and Aimee. With his complaint he filed an "affidavit in compliance with Uniform Child Custody Jurisdiction Act," explaining that he was seeking the custody of both children and representing that "I have not participated as a party, witness, or in any other capacity in any other litigation concerning the custody of said Lisa Monique Verbin in this or any other jurisdiction, nor do I have information of any custody proceeding concerning said child pending in a court of this or any jurisdiction." It need hardly be said that this was a patent falsehood. In fact, just a week later Mr. Verbin appeared through his attorney in a Washington

court once again on the very issue of custody of Lisa, as well as Aimee.

On January 18 the King County Superior Court hearing regarding child custody pending trial was held. A temporary order was issued, awarding temporary custody of Aimee to Mrs. Verbin and temporary custody of Lisa to Mr. Verbin. Attorneys for both parties agreed to transfer the custody issue to family court for investigation. Mr. Verbin made no motion to the Washington court to decline jurisdiction. In fact, the attorneys agreed to an order setting the trial date for early in August 1977. These facts demonstrate the extent to which Mr. Verbin had committed himself to the jurisdiction of the State of Washington, even after commencing the Maryland action. It appears from the record that at this point neither court had been apprised of the fact that proceedings were pending in another jurisdiction.

With the assistance of her Washington attorney, Mrs. Verbin prepared an answer to the Maryland subpoena which issued upon the filing of Mr. Verbin's complaint for divorce. On February 9, 1977, several weeks after the Washington court issued its temporary custody order, and at a time when Mrs. Verbin was not represented by counsel in the Maryland proceeding, the Maryland court issued a temporary custody order granting custody of both children to Mr. Verbin. During those proceedings Mr. Verbin testified, apparently for the first time, that a temporary order on show cause had been issued in the state of Washington. The record does not suggest that Mr. Verbin fully disclosed the nature and extent of the Washington proceedings to the Maryland court at this time. Indeed, in view of subsequent actions taken by the Maryland court, we may infer that he disclosed very little of his participation in the courts of this state.

On May 31, 1977, a Washington family court custody report was issued and served on both parties. The report was highly favorable to Mrs. Verbin, stating that "Aimee's current situation [is] a secure one for her, and a milieu in

which she can achieve healthy growth." It was not until after this report, adverse to his own interests, that Mr. Verbin first moved the Washington court to decline jurisdiction in favor of the Maryland proceedings. At that time Mr. Verbin had been an active participant in Washington courts for 6 months. He had appeared through his attorney at two hearings, agreed to a family court investigation on the custody question, and agreed to a date for trial on the merits. The trial was imminent. It should also be noted that in apprising the Washington court of the Maryland proceeding he submitted the first page of his Maryland affidavit, but *omitted* the page on which he had made the false statement that he was not a party to any other action regarding Lisa's custody. He was apparently intent on concealing the fact that he had fraudulently invoked the jurisdiction of the Maryland court.

Despite the fact that the Maryland action was commenced 2 months after the Washington action, it came to trial first, on July 26, 1977. Mrs. Verbin obtained counsel to represent her in Maryland just a few days before the trial. Her Maryland attorney asked the court to stay its proceedings in view of the Washington action, but was unable to apprise the Maryland court of the posture of the proceedings in this state. Mr. Verbin apparently made no effort to do so. The Maryland judge held the court could not stay Maryland proceedings on the very day of trial with so little information regarding the Washington action, and the trial commenced. Mr. Verbin testified and put forward two other witnesses on his own behalf. Mrs. Verbin, who had little money and was forced to proceed in forma pauperis in this state, did not appear in person or put forward any witnesses on her own behalf. The Maryland court was apparently unaware of the Washington family court report regarding the welfare of the child Aimee. In any event, the court entered a decree of divorce granting custody of both children to Mr. Verbin.

Just a week later the trial of Mrs. Verbin's dissolution action commenced in King County before the Honorable

Robert Elston. Mr. Verbin again moved the court to decline jurisdiction, but the motion was denied. In an oral decision following trial the court announced the dissolution would be granted and the custody determination of the Maryland court adopted. Counsel for Mrs. Verbin made a motion for reconsideration. As a result, a partial decree of dissolution was entered on September 26, 1977, along with an order granting a new trial on the issue of custody, the court finding it had insufficient evidence upon which to find Mr. Verbin was a fit and proper person to assume custody of the children.

In October 1977, a supplemental family court report was issued, strongly recommending that Aimee remain with Mrs. Verbin. The report stated that "[i]t would be extremely traumatic for Aimee to be separated from her mother." On November 17, the second trial on the custody issue commenced before the Honorable Charles Denney, judge pro tempore. The court denied Mr. Verbin's motions for enforcement of the Maryland decree and to decline jurisdiction. It considered substantial testimony regarding the child Aimee, including that of Mrs. Verbin, her mother, an acquaintance, Aimee's schoolteacher, the family court worker, Gladys Stern, and a child psychologist, Dr. Edward Freedman. Mr. Verbin appeared in person to testify and presented two other witnesses. Ms. Stern and Dr. Freedman strongly recommended giving Mrs. Verbin permanent custody of Aimee, stating their expert opinions that separating her from her mother now would be traumatic and definitely not in Aimee's best interests. In his deposition, Dr. Freedman stated he was very concerned about the possibility of a "serious disruption in her development" if Aimee were to be separated from her mother.

On December 29, 1977, Judge Denney entered findings of fact that Mrs. Verbin was a fit and proper person to have custody of Aimee, that it was in Aimee's best interest that Mrs. Verbin be awarded permanent custody of Aimee, and that it was in the best interest of Lisa that Mr. Verbin be awarded permanent custody of Lisa. The court concluded it

had jurisdiction to determine the custody of Aimee, and had discretion to determine whether a decree different from the custody decree of Maryland should be entered, "in the best interest of the children under all of the facts and circumstances as they appear in the record and at trial." The final decree of dissolution awarded permanent custody of Aimee to Mrs. Verbin, and permanent custody of Lisa to Mr. Verbin.

Mr. Verbin, hereinafter referred to as appellant, now appeals from this final decree. He assigns error to the trial court's refusal to decline jurisdiction, adopt the Maryland custody determination as its own, or otherwise enforce the Maryland decree. He also urges this court to judicially adopt the provisions of the Uniform Child Custody Jurisdiction Act, hereinafter referred to as the Uniform Act, which he maintains requires enforcement of the decree. 1968 Uniform Child Custody Jurisdiction Act, 9 U.L.A., *Matrimonial, Family and Health Laws* 99 (Master ed. 1973). We hold that under the law of the State of Washington the trial court had jurisdiction to determine custody of the child Aimee and properly refused to decline jurisdiction in favor of proceedings begun long after its own proceedings were commenced. We also hold the court did not err in refusing to enforce the Maryland decree and awarding permanent custody of Aimee to Mrs. Verbin, where it had found such an award to be in Aimee's best interests. Furthermore, while we do not judicially adopt the provisions of the Uniform Act, we note that the result here would be no different if that act were in effect in the state of Washington.[1]

---

[1]Two months after oral argument in this case the state legislature enacted the Uniform Child Custody Jurisdiction Act with some modifications. Laws of 1979, ch. 98. The law will become effective on June 7, 1979. It was not in effect at the time of the trial below, or at the time of the deliberations of this court. It therefore does not affect the outcome of this case. As noted below, however, the result reached would be the same even if the provisions of that statute had been in effect at the time of the trial.

I. The motion to decline jurisdiction.

Appellant contends the trial court erred in refusing to decline jurisdiction on the ground the Maryland court, which had jurisdiction under its own law, was the proper forum under both the doctrine of forum non conveniens and under the Uniform Act. He also contends respondent and the child Aimee could not have attained a domicile in this state under the "clean hands" doctrine, and thus failed to establish any jurisdictional basis upon which the Washington court could enter a custody decree.

■ A Washington court has jurisdiction to determine the permanent custody of a child who is a domiciliary of this state. *In re Marriage of Dunkley,* 89 Wn.2d 777, 575 P.2d 1071 (1978); *In re Marriage of Saucido,* 85 Wn.2d 653, 538 P.2d 1219 (1975); *In re Mullins,* 26 Wn.2d 419, 174 P.2d 790 (1946). A court may decline jurisdiction, however, if certain circumstances are present.

If a parent brought the child into Washington in violation of a permanent and valid custody decree of a sister state, the court will decline jurisdiction under the "clean hands" doctrine on the ground the parent could not have obtained the requisite domicile. *In re Mullins, supra.* This doctrine is embodied in section 8 of the Uniform Act as a matter within the trial court's discretion. Uniform Act, *supra* at 115. The Uniform Act extends the doctrine to circumstances of wrongful conduct in taking or retaining a child, not just to violations of valid custody decrees. Maryland's legislature has adopted the Uniform Act, including this provision for declining jurisdiction. Md. Ann. Code, art. 16, § 190 (1978 Cum. Supp.).

Although this court continues to commend the Uniform Act to the legislature as we did in *In re Marriage of Dunkley, supra,* the act is not the law of the State of Washington. The Washington rule is mandatory and requires a court to decline jurisdiction, but only where the circumstances show the parent has violated a binding and permanent custody decree. In this case respondent did not violate such a decree. She was fully entitled to obtain a

separate domicile for herself and her children under both Maryland and Washington state law. *See Miller v. Miller,* 247 Md. 358, 231 A.2d 27 (1967); *Pickler v. Pickler,* 5 Wn. App. 627, 489 P.2d 932 (1971). We conclude there was no bar to the exercise of Washington jurisdiction under the "clean hands" doctrine.

We note, however, that even under section 8 of the Uniform Act our court would not have been required to decline jurisdiction. Section 8 contemplates consideration of all relevant facts and circumstances, and the exercise of discretion by the trial court to determine what is "just and proper under the circumstances." In this case respondent justifiably feared for the emotional well–being of her children as well as her own physical and emotional safety, if they stayed in the Maryland home. She fled to the comfort of her own parents and siblings, who were also able to extend security and love to her children. The trial court, in the exercise of its discretion, could well have found her conduct was not wrongful and did not require it to decline jurisdiction under the Uniform Act.

A second, and discretionary, ground for refusal to exercise jurisdiction which is urged by appellant, lies in the doctrine of forum non conveniens. This doctrine will be applied in child custody cases where, for example, custody litigation is pending in another state, or that state is exercising continuing jurisdiction over the parties and subject matter, and the relevant witnesses and accumulated court testimony are present in that other state. *In re Marriage of Dunkley, supra.* This doctrine is codified in section 7 of the Uniform Act, and Maryland has a corresponding provision. We find no bar created by the Washington rule, or the Uniform Act provision, Md. Ann. Code, art. 16, § 189 (1978 Cum. Supp.), to the exercise of jurisdiction in this case.

At the time appellant first moved the Washington court to decline jurisdiction Aimee had lived in Washington for more than a year. The important witnesses regarding her welfare—her teacher, the family court investigator, the child psychiatrist, her friends and relatives—were all in this

state. Appellant had submitted evidence in the nature of affidavits and financial statements. He had demonstrated that he was financially able to appear personally in Washington to represent his own interests, while respondent clearly could not afford to vigorously litigate custody proceedings in Maryland. The Washington court had received a full report on Aimee from the family court, and had been involved in these custody proceedings for 6 months. At the time of the second trial the proceedings had been in progress for more than 1 year and a second family court report was available. The Maryland court, on the other hand, had heard no witnesses on respondent's behalf and had conducted no investigation of Aimee's situation. Its proceedings were commenced long after appellant had appeared in Washington court and begun to vigorously litigate the custody issue. The court did not err in refusing to decline jurisdiction on the ground of forum non conveniens.

Finally, there can be no question that respondent and Aimee were in fact domiciliaries of this state. Respondent came to Washington with the intent to reside here, near her own family, and to become a domiciliary. As pointed out above, there was no legal bar to her doing so. She did not violate any custody decree. Under these circumstances it would have been an abuse of discretion for the court to decline to exercise its jurisdiction to decide Aimee's custody.

We note also that at the time appellant filed his complaint for divorce in Maryland the courts of that state could have properly declined to exercise jurisdiction under Maryland law. Pursuant to Maryland's version of the Uniform Act, a Maryland court is precluded from exercising its jurisdiction to determine custody of a child where a proceeding concerning such custody is pending in another jurisdiction, unless certain other circumstances, not present here, are shown. Md. Ann. Code, art. 16, § 188 (1978 Cum. Supp.). Indeed, the clear intent of the Uniform Act, and of Maryland's substantially identical provision, is to allow priority in time to determine which court will proceed,

absent a determination by the state having priority that forum non conveniens or some other appropriate reason requires a different result. *See* Comment to section 6, Uniform Act, *supra* at 112. We may assume that if appellant had fully and candidly informed the Maryland court of his participation in the Washington proceedings, that court might well have declined to exercise jurisdiction on this ground.

II. The motion to enforce the Maryland decree.

As a second ground for reversal of the custody order below, appellant contends he was entitled to enforcement of the Maryland decree under the full faith and credit clause, article IV, section 1 of the United States Constitution, and under the Uniform Enforcement of Foreign Judgments Act, RCW 6.36. Foreign judgments are entitled to enforcement, under the language of RCW 6.36.010, only if they are entitled to full faith and credit. The issue thus turns on the responsibility of the Washington court under that constitutional provision.

While there is considerable disagreement among scholars concerning the extent to which a state is constitutionally required to give effect to foreign custody decrees, and in the absence of a United States Supreme Court ruling on the matter, this state had adopted the rule that a permanent child custody award by a sister state having jurisdiction of the parties and the subject matter is entitled to full faith and credit. *In re Marriage of Saucido, supra* at 657. Under some circumstances, though, a court may decline to enforce such a decree or may modify it in order to protect the best interests of the child. Those circumstances are present here.

A court may refuse to give full faith and credit if the decree was fraudulently obtained. *In re Mullins, supra* at 426. *See* Restatement (Second) of the Law of Judgments §§ 118, 130 (Tent. Draft 1979). Here, even though appellant was actively involved in litigation over the custody of both his daughters, he falsely attested to the Maryland court that he was not involved in such litigation at the time he

filed his divorce complaint. Although he later admitted the fact of the Washington proceedings, it appears from the record that he never fully apprised the Maryland court of their nature and extent. The Maryland court thus had no reason to believe Washington could or would adequately protect the best interests of the children involved. In view of respondent's inability to present evidence in her favor, it is not surprising that the court awarded appellant custody of both children. Yet, had it been fully aware of the nature and extent of the Washington proceedings, it may well have declined jurisdiction, or at least required more evidence regarding Aimee's welfare. Appellant, having perpetrated this fraud on the Maryland court, may not now require a Washington court to enforce his Maryland decree.

Moreover, the Washington court had additional grounds for entering its own custody order. A Washington court may modify the custody decree of a sister state where significant facts not known to the decreeing court are shown. For example, a change of circumstances since the entry of a decree may allow a court having jurisdiction over parties and subject matter to modify the foreign decree. *State ex rel. Marthens v. Superior Court,* 25 Wn.2d 125, 169 P.2d 626 (1946). Similarly, a proceeding resulting in a default decree may have deprived the court of the opportunity to fully examine the relevant circumstances, thus allowing a court apprised of those circumstances to modify the decree to protect the best interests of the child. *In re Rankin,* 76 Wn.2d 533, 458 P.2d 176 (1969). Even in a proceeding where both parents are parties, however, there may be significant facts in existence which relate to a child's welfare but which are not put before the court. *See New York ex rel. Halvey v. Halvey,* 330 U.S. 610, 91 L. Ed. 1133, 67 S. Ct. 903 (1947). The existence of such facts is a ground for modifying a custody decree pursuant to our own statute, RCW 26.09.260. *McDaniel v. McDaniel,* 14 Wn. App. 194, 539 P.2d 699 (1975). *See also In re Rankin, supra.*

In this case the Maryland court was apparently not apprised of the results of the family court investigation in

Washington, or of the child psychologist's expert opinion that it is in Aimee's best interest that she remain in Washington with her mother. Nor did the court consider any testimony on respondent's behalf which could illuminate Aimee's situation in her Washington home. In short, it was not apprised of the most significant facts regarding Aimee's welfare.

The Washington court did have these facts before it, and was in a far better position to determine and protect Aimee's best interests. Its custody award in effect modified the Maryland decree in a manner consistent with both the law and policy of the State of Washington.

Finally, it would be inappropriate to enforce the decree of a sister state when to do so would violate the policies of the full faith and credit clause itself. *See* 3 Restatement (Second) of Conflict of Laws § 103 (1969). The full faith and credit clause should function to encourage national unity. *See May v. Anderson*, 345 U.S. 528, 536, 97 L. Ed. 1221, 73 S. Ct. 840 (1953) (Frankfurter, J., concurring). Yet enforcement of the decree in this case would only further the divisive and deplorable practice of forum shopping, by encouraging parents to bring suit in a state where the other parent is financially or physically unable to vigorously litigate. Since respondent was unable to appear early in the Maryland proceedings and marshal the evidence in her favor before that court, the trial proceeded quickly and appellant got a favorable decree first. If we were to enforce that decree despite the fact that Washington had jurisdiction first and more fully considered Aimee's welfare, we would only encourage this practice. We conclude the trial court was fully justified in refusing to enforce the Maryland decree.

III. The merits of the custody order.

■ Appellant maintains the award of custody of Aimee to respondent was not in the child's best interest. He does not assign error to the trial court's finding of fact that such an award is in Aimee's best interest. This omission is of

course fatal to his argument, because the court's finding has become an established fact of the case. *Lakeside Pump & Equip., Inc. v. Austin Constr. Co.,* 89 Wn.2d 839, 576 P.2d 392 (1978). Even if appellant had properly preserved the question for review, however, we could only conclude that the court's finding is amply supported by the record.

The testimony at trial established that Aimee is very close to her mother, feels happy and secure in her Washington home, and does not desire to leave. Expert witness testimony established that separating her from her mother now could be very damaging to her.

Appellant, on the other hand, made little showing of his ability to fulfill Aimee's needs. He has been reluctant to provide any money for her support and maintenance. Furthermore, his dishonest conduct in misleading the courts of two states does little to commend him for the role of custodial parent. The trial court did not err in finding it was in Aimee's best interest to stay with respondent.

Affirmed.

UTTER, C.J., and ROSELLINI, STAFFORD, WRIGHT, BRACHTENBACH, DOLLIVER, HICKS, and WILLIAMS, JJ., concur.

Reconsideration denied August 21, 1979.