[Civ. No. 26034. Fourth Dist., Div. One. Dec. 16, 1981.]

EARL L. HAFER, JR., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
JULIA SANDRA FIELDS, Real Party in Interest.

COUNSEL

Brav & Schwartz and Steven N. Schwartz for Petitioner.

No appearance for Respondent.

Matthew Nelson Lees for Real Party in Interest.

OPINION

BROWN (Gerald), P. J.—In this child custody modification proceeding the mother Julia Sandra Fields has, in our opinion, improperly sought the assistance of the San Diego Superior Court to change physical custody to herself after the children have lived more than three years with their father, Earl L. Hafer, Jr., in Idaho.

The original dissolution decree from the San Diego Superior Court dated September 27, 1977, gave the parents joint legal custody of the two girls, now aged seven and nine, with physical custody to Earl and visitation rights to Julia. The children have lived with Earl in Idaho since then except for a period when Julia admittedly abducted the chil-

dren in December 1980 and fled with them to Florida, until with the assistance of the process of the San Diego court Earl regained custody of the girls in March 1981.

On June 30, 1981, Julia filed a child custody modification action in San Diego, based on alleged medical neglect of the children by Earl. Earl opposed the petition on jurisdictional grounds under the Uniform Child Custody Jurisdiction Act (UCCJA). He contended Idaho, which has adopted the UCCJA, is the proper forum. At a hearing on July 7, 1981, the superior court assumed jurisdiction of the case, but ordered the children to be returned to Earl in Idaho where they were to start school by August 24, 1981. The younger child is deaf and attends a state school for the deaf and blind in Idaho. The superior court did not find an emergency existed nor that the children were neglected or abused, but based jurisdiction on the fact the San Diego court had rendered the original custody decree, hence retained continuing jurisdiction to modify it provided there was no pending proceeding in Idaho.

Earl petitioned this court for a writ of prohibition on August 4, 1981, contending lack of jurisdiction in the California court, improper venue, and unclean hands on Julia's part because of child stealing. After the time for preliminary opposition had lapsed, and no response had been received, this court issued an alternative writ of prohibition on August 19, 1981, strongly urging the superior court to reconsider its order assuming jurisdiction because it rested on an incorrect basis (for reasons to be discussed). Meanwhile, unknown to this court, the superior court on August 18 had made a chambers order after an untranscribed conference, permitting Julia to retain custody until August 31, when further proceedings were scheduled.

However, after we issued the order for alternative writ, the superior court held a hearing on August 21, 1981, at which it declined to change its order. It continued to permit the children to remain in San Diego with Julia pending investigation.

At the August 21 hearing, the attorney for Julia tendered hearsay evidence which the court recognized was not in proper declaration form. The attorney made accusations Earl had neglected dental care for the younger child as well as a painful ear problem and had not obtained medical attention for the older girl's bladder infection, as well as other similar accusations. The attorney argued there are substantial contacts between the children and California consisting of "a significant number

of doctors located ... in San Diego who would give significant testimony to the Court with regard to the medical attention of these children." He also named a psychologist who would testify. Although recognizing no competent evidence of child abuse or emergency condition was before it, and despite the issuance of our alternative writ stating the clear lack of jurisdictional basis in California, the superior court nevertheless persisted in hearing the modification procedure, implying, without specific findings, the existence of an emergency. It stated: "I agree ... the preliminary determination has to be whether ... there is jurisdiction and ... the preliminary determination does not revolve normally around the best interest of the child. But, I think there is an exception, and I think that exception is where the Court is led to believe through auspices related to it—and those involve the mediation counselors, the investigators and so forth—that in fact the children are being, in the Code language, neglected, subject to mistreatment; and it was with that in mind and those concerns that I originally assumed jurisdiction and ordered a full custody investigation. Whether the language was properly utilized or not, I don't know; whether I will be upheld on appeal, I don't know.

"But, it is my concern that the children apparently have been neglected in a medical sense; they apparently have been left alone in a physical sense on occasions; and it was my opinion that it was in the best interest of these children that this state assume jurisdiction and that there was in fact a significant connection, through the families, with the State of California for the children; that there was evidence here concerning their education, both past and present, and concerning their medical protection and their medical treatment as well as their future care and protection.

"It was those things I had in mind. Whether they will be found to be sufficient, I don't know."

Meanwhile, this court on August 21, 1981, granted Earl a stay of all proceedings in the superior court, and ordered the children to be returned to him by August 24, in harmony with the superior court's original July 7 order.

On September 3, 1981, Earl filed here an affidavit re contempt seeking to hold Julia in contempt of this court's August 21 order. Earl alleged he had resided at the same address in Gooding, Idaho, for more than three years; Julia is aware of the location of the residence and has

been there before; she has custody of the children and the ability to comply with the order to return them but has not done so as of September 2, 1981. Filed with the affidavit is the declaration of Steven Schwartz, Earl's attorney, stating this court's August 21 order was personally served on Matthew Lees, counsel for Julia, on August 21. Lees' papers filed in this court after issuance of the alternative writ allege he sent written communication to Julia explaining our August 21 order. Julia was scheduled to appear in superior court for a hearing on August 31, at which time Schwartz expected to serve her personally with the August 21 order, but she did not appear nor did her attorney. The probation officer investigating the matter, Swenson, made telephone calls attempting to locate Julia and could not do so. One call was to Lees' office. Lees admits being in his office that day but denies knowing of the call. Based on these facts and on Julia's admitted act of child stealing, Schwartz asked this court to issue an order to show cause re contempt and to permit service on Julia's attorney in lieu of personal service.

In responding to the contempt charge, Lees claimed on August 18 the superior court made its chambers order permitting Julia to retain custody until August 31, and she took the children on a camping vacation and could not be personally reached. However, at oral argument Lees said Julia was in his office on August 31, she is now in California with the children and she knows of our August 21 order to deliver the children.

*Facts*

The petition for writ of prohibition filed here states the dissolution decree was granted in September 1977, and the children have lived with Earl in Idaho since that time, more than three years. The younger girl attends a state school for the deaf and blind, where Earl is employed. It alleges all the evidence of the girls' home life and schooling for the past three years is based in Idaho. Attached to the petition are letters from the superintendent and the director of education of the state school in Idaho stating Earl provides a loving home for the girls and they are doing well in school. A letter from the health supervisor at the school states the girls are healthy, happy and well cared for.

At the July 7 hearing a court counselor testified. She recommended a full custody evaluation and in the interim, the mother have the children for August and they return to school in Idaho pending final resolution

of the matter. She stated such would be in accordance with the children's wishes.

Later, in connection with further proceedings in the superior court after we issued our alternative writ, counsel for Julia filed documents with the superior court including his declaration which admitted Julia's child stealing and stated she was "legally wrong but morally right." It contended Earl ignores the medical complaints of the girls and neglects them. Also, allegedly, he leaves the older girl to babysit the younger one, allows them to eat foods they are allergic to, and is not a loving parent. He attaches the letter of a psychologist dated August 5, 1981, which states, after 12 hours of interviewing with the mother, the children, and the new husband, that the girls are insecure and unhappy with the father and need their mother. It says the father does not take them out to "fun" activities, disciplines them harshly with a hairbrush and a stick (according to the girls, aged nine and seven) and is not loving, and both children wish to stay with their mother. It claims giving custody to Earl originally was a mistake and was done because Julia, who is deaf, did not fully understand the import of the legal documents. Allegedly Earl was abusive to Julia during marriage, repressive and occasionally violent. (Yet she voluntarily left the children in his custody when she left him.) The letter concludes Julia is warm, loving and caring and should have custody. The psychologist expresses no opinion of Earl, since they have never met. The letter states no facts of immediate emergency to the girls' welfare.

At the hearing of August 21 the investigator testified. She said, based on three hours spent with the girls, their mother and an interpreter, the children are extremely close to their mother and wish to live with her and not return to their father. They told the counselor their father does not believe them when they tell him they are ill, but their mother takes them to the doctor. Their father sends them to their room or spanks them with a switch if they disobey. Also they have been left alone on occasion when they were as young as six and eight. Further, the counselor said she received a report from a San Diego dentist which shows Julia took the younger child to him December 27, 1980, during visitation, and the child needed cleaning and filling of numerous teeth, and the situation appeared to be one which should have been routinely taken care of by a custodial parent.

Other evidence offered to this court consists of Julia's notes describing alleged incidents of medical and dental neglect. She claims the

father does not take them to the doctor when they complain of symptoms, the younger girl has badly decayed teeth and painful ear problems which need attention, and the older one had a urinary tract infection which was not immediately treated. These notes are not accompanied by medical reports nor detailed descriptions of the symptoms which Earl allegedly ignored.

*Discussion*

■ Earl contends the superior court lacks modification jurisdiction under the UCCJA, Civil Code section 5152, because California is not the home state, there are no substantial contacts any longer between California and the children, and there is neither a showing nor a finding of emergency. Further, he contends the venue is improper under section 5156 because the forum is inconvenient, all the evidence of the children's home and schooling is in Idaho. Also, he argues Julia, by virtue of her earlier admitted child stealing and her present contempt of this court's order, has unclean hands and should not be assisted by a California forum (Civ. Code, § 5157). He argues, correctly, the fact the San Diego court originally made the custody decree is not a basis for jurisdiction now; in order to have present modification jurisdiction, the court must find a jurisdictional basis as defined in the UCCJA (*Clark v. Superior Court* (1977) 73 Cal.App.3d 298 [140 Cal.Rptr. 709]; *In re Marriage of Steiner* (1979) 89 Cal.App.3d 363 [152 Cal.Rptr. 612]; *Schlumpf v. Superior Court* (1978) 79 Cal.App.3d 892 [145 Cal.Rptr. 190]).

We agree there is no demonstrated basis for jurisdiction here. The home state is Idaho, there are no substantial demonstrated contacts proved or alleged between California and the children, there is no emergency, and a forum is presumptively available in Idaho, a state in which the UCCJA is in effect, and where the children have lived for more than three years. Further, the superior court erred in finding jurisdiction here simply because no proceeding was then pending in Idaho. The UCCJA is intended to prevent potential as well as actual conflict, and prevents bringing modification procedures in unsuitable forums without making a bona fide attempt to invoke the jurisdiction of the correct court. (See *Clark v. Superior Court, supra*, 73 Cal.App.3d 298; *In re Marriage of Steiner, supra*, 89 Cal.App.3d 363; *Schlumpf v. Superior Court, supra*, 79 Cal.App.3d 892.) The venue would be improper even if there were jurisdiction, and also, there exists adequate basis to deny

the California forum for unclean hands (Civ. Code, § 5157). We emphasize, no competent evidence before the superior court warranted a finding of emergency and no such finding was unequivocally made. Further, the jurisdictional problem is not affected because cogent reasons may exist to change the custody. The Idaho courts can do that also.

In our order for an alternative writ, we stated the legal reasons why the superior court lacks jurisdiction over this modification procedure and invited the superior court to comply voluntarily, to save time and money and expedite initiation of proceedings in the correct forum in Idaho. Unfortunately, the superior court did not see fit to follow these clear directives, possibly under a mistaken impression we had not fully considered the matter. To the contrary, however, we stated our reasons precisely because we had fully considered all available information in the record as well as the relevant legal issues and had reached a reasoned decision requiring relinquishment of jurisdiction, which we attempted to effect as speedily as possible because in child custody disputes particularly, time is critical and delay harms all parties. We had no power to issue a peremptory writ in the first instance (Code Civ. Proc., § 1088) because such relief was not requested and because real party had not responded to the petition.[1] Nevertheless, the complete and candid presentation of the record by petitioner had fully informed this court of both sides of the controversy and of the superior court's reasons for its decision, and we were privy to all data which was properly before

---

[1] When the petition was filed here on August 4, 1981, the clerk of this court attempted unsuccessfully to contact the attorney for Julia to request preliminary opposition. The attorney was apparently on vacation and left no responsible person in charge of this matter nor any means by which he could be reached, despite the immediate urgency of this pending custody matter. After the due date had passed for the lodging of opposition (which was five days after the filing date, or Aug. 10, 1981, since Aug. 9 is a Sunday) this court issued its educational alternative writ. Later when he returned from his vacation, Julia's attorney informed both the superior court and this court that he had been misled by a clerk in the office of this court into believing his opposition was not due until August 20. This court knows of no basis for that assertion; it has carefully questioned the employees in question; all say they did not give such a date. To have chosen that date would make no sense, since no rule or statute causes a preliminary opposition to be due 16 days after the petition's filing date (i.e., Aug. 20 when filed on Aug. 4). However, all later papers lodged on Julia's behalf have been given full consideration in this court, despite their unjustified lateness and the equally unjustified accusations made against the court's staff. Nothing filed by real party affects our decision on the jurisdictional issue; the papers filed are replete with hearsay evidence and accusations against Earl which would be better made and proved when the merits of the modification procedure are heard, in a proper forum. We commend the attorney for Earl in declining to respond in kind, with inadmissible hearsay accusations, at the superior court level or here.

the superior court when it made its first ruling. Certainly it remained possible for this court to change its decision after issuance of this alternative writ, just as a change in decision is possible on petition for rehearing after an appeal has been decided, but both events are rare. Without the cooperation of the superior court here, we were compelled to engage in the cumbersome alternative writ and hearing procedure, which further delayed matters and benefited no party.

The dissent states our ruling prevents the superior court from determining its own jurisdiction here. However, the superior court in fact decided it did have jurisdiction. The judge said, "I originally assumed jurisdiction and ordered a full custody investigation." The issue before us is whether a valid basis for such jurisdiction could be demonstrated.

Conceding there is no evidence of emergency in this record, the dissent states such evidence might have been proved. Here, however, we have a situation where children have been removed from their home of over three years' duration and brought into another state to secure a custody modification. This action interrupted the continuity and stability of their daily life and disrupted their relationship with their father. Certainly if the mother had described a situation of peril to the children requiring their immediate removal, then it would be the responsibility of the chosen forum to afford an opportunity to prove such charges. If, however, the alleged facts, even if assumed to be true, do not show such peril, then there is no justification for holding a full-fledged, time-consuming custody investigation, in a forum far from the home state.

Here the mother has completely failed to describe any emergency condition warranting her harmful and lawless conduct. If the father is somewhat harsh, insensitive, too quick to discipline, that is not imminent child abuse. His possible slowness to diagnose medical problems or provide treatment is not such neglect as would warrant deprivation of custody on an emergency basis. We talk here of allegations of dental neglect, unawareness of early symptoms of bladder infection, possibly some spankings with a "switch" or hairbrush. This alleged neglectful and harsh parenting has been going on for more than three years. Is this tantamount to an emergency requiring removal of the children to California for a custodial modification procedure?

Under the UCCJA, the emergency concept is a narrow exception to home state jurisdiction, applying only in cases of genuine

immediate, substantial, threatened physical harm to the child.[2] The normal preference is for adjudicating custody disputes in the home state where the children live, where the most evidence of their daily living conditions will be found, where the continuity and stability of their parental relationship and their daily routines will be least disrupted by the legal procedure.[3] This case shows a prime example of the kind of disruption the act was intended to prevent. Instead of going to Idaho where the children have lived for more than three years, the mother has taken them several hundred miles into California, interrupting their care, their relationship with their father, their friends, and their schooling, all on the basis of a network of hearsay allegations which at best suggest a poor job of parenting. What is the point of this interruption of their lives and how does it further their best interests? Although the mother claims to have acted out of concern for her children's welfare, we find no objective reason why she needed to litigate this matter in California, or why such choice furthered the children's best interests. Not only does her conduct exhibit lawlessness, which in general does not further anyone's best interests, but it is highly unsettling and traumatic for the children, subjected not only to the inevitable stress of the modification procedure, but also to the wholly unnecessary relocation which disrupts the paternal home in which the children had been permitted to live for more than three years.

Jurisdictional disputes under the UCCJA are not "technical" in the sense of being irrelevant to the welfare of the living children involved. On the contrary, the act exists and defines jurisdictional rules to best serve the interests of the hapless children of divorce. The purpose of the act, as stated by its drafters and by all the commentators, is to maximize continuity and stability in the lives of these children and to minimize disruption caused by continual dislocations and custody battles of the warring parents. The act aims to make definite and predictable rules of choice of forum by which the parties must abide. If the courts do not enforce these rules in all cases, the parties will continue to

[2]Bodenheimer, *Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws* (1969) 22 Vand.L.Rev. 1207, 1229-1230 (cases of abandonment or . . . emergency situations of neglect or mistreatment); Comment (1974) 62 Cal.L.Rev. 365, 371 (immediate and substantial physical danger); Commissioners' Note to UCCJA, prefatory note ("the act is designed to bring some semblance of order into the existing chaos. It limits custody jurisdiction to the state where the child has his home . . .").

[3]Bodenheimer, *supra*, at pages 1225-1226. (See also Commissioners' Note to UCCJA, *supra*, prefatory note, describing the principal evil at which the act is aimed as child snatching by dissatisfied noncustodial parents to forums they regard as more favorable; and *Clark* v. *Superior Court, supra*, 73 Cal.App.3d 298, 310.)

flout the law, the dissatisfied parent always hoping some new forum will be more sympathetic to his or her claim. The instability caused by refusal to enforce jurisdictional rules (and also rules governing choice of forum) in this area, as in no other, irreparably harms the interests of all concerned, especially the children.

*In re Marriage of Carney* (1979) 24 Cal.3d 725, 730-731 [157 Cal. Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028], strongly emphasizes children's needs for stability and continuity. So also does the act.[4] The home state concept is therefore of the utmost importance in the act, requiring the courts, when possible, to choose that forum to adjudicate custody disputes. The children's home is the presumptively correct forum. A showing of need to change custody does not alter the fact the modification process will be less harmful to the children if conducted near their present home. Thus, here no reason appears to favor the California forum unless one assumes inability of the Idaho courts to decide the matter fairly. There is no factual or legal basis for such an assumption and it violates the full faith and credit doctrine. It is counterproductive to the aim of continuity, which the act seeks to uphold, to drag children, as here, into a distant state to litigate and relitigate custody, simply because the noncustodial parent desires it.

We note too, in the present case, the superior court's decision not to make a forthright finding of "emergency" is strong circumstantial evidence of the absence of any real emergency. The court's real concern was the wisdom of the choice of custodial parent. That concern, we repeat, must be litigated in Idaho where the children live. Had there been any hint of real emergency here, we doubt the findings would have been

---

[4]See Commissioner's Prefatory Note, *supra*, "When a decree has been rendered awarding custody to one of the parties, this is by no means the end of the child's migrations. It is well known that those who lose a court battle over custody are often unwilling to accept the judgment of the court. They will remove the child in an unguarded moment or fail to return him after a visit and will seek their luck in the court of a distant state where they hope to find—and often do find—a more sympathetic ear for their plea for custody. The party deprived of the child may then resort to similar tactics to recover the child and this 'game' may continue for years, with the child thrown back and forth from state to state, never coming to rest in one single home and in one community.

"The harm done to children by these experiences can hardly be overestimated. It does not require an expert in the behavorial sciences to know that a child, especially during his early years and the years of growth, needs security and stability of environment and a continuity of affection. A child who has never been given the chance to develop a sense of belonging and whose personal attachments when beginning to form are cruelly disrupted, may well be crippled for life, to his own lasting detriment and the detriment of society."

so tentative. Emergency means imminent child abuse. Here we have children who have lived with their father for some time. The fact they may temporarily suggest a preference for the noncustodial parent who has not had the care and discipline of them for these years, hardly rises above the level of the routine. The issue of inability to diagnose medical ailments is similarly not urgent. None of these reasons justify dragging children hundreds of miles from home when they could pursue their schooling and their usual routines while local courts considered the wisdom of their custodial placement. Such a procedure would have been far more in their interests than the kind of running and hiding, with attendant tension and fear, which has gone on here.

Similarly, the so-called "clean hands" doctrine is intended to further the act's purposes, not to punish the noncustodial parent. Whether Julia will ultimately be punished by contempt procedures for her lawlessness is not relevant to the question whether the California forum should be denied to her to discourage future abductions, both by her and by all parents similarly situated. We, as a court of law, must consistently refuse to condone what has happened here if the aims of the act are ever to be achieved. It is essential to discourage parents from unnecessary child stealing. So long as they have any hope of succeeding in such maneuvers, provided they allege a sufficient level of parental neglect, they will continue, regrettably, to engage in such conduct. The Legislature has decided such conduct is not in the children's best interests. When we apply the law we act in the children's interests.

Judges are not Solomons or gods. We cannot know, any more than any mortal can, what custodial situation is correct in every situation. We do know, however, what rules govern the choice of forum. It is our job consistently to enforce those rules. The UCCJA's jurisdictional mandate requires child custody litigation to take place in the home state absent compelling justification for removal. The rule exists to prevent abduction, child stealing, and forum shopping, all of which conduct the Legislature finds to be in the best interests of no one. Our decision here fulfills the mandate of the law. No case we have found permits removal from the home state on a showing remotely comparable to what we have here. There is no justification to permit it.

*Order to Show Cause re Contempt*

This court has both the power and the duty to enforce its orders, specifically our order of August 21 decreeing return of the children to Earl

by August 24 (*Smith* v. *Smith* (1953) 120 Cal.App.2d 474, 478-479 [261 P.2d 567]). Further, because this is a continuation of the modification proceeding in which Julia was represented by counsel, we have the authority to permit service upon the attorney when it is impossible to personally serve the real party (*Smith* v. *Smith, supra,* at p. 483; *Shibley* v. *Superior Court* (1927) 202 Cal. 738 [262 P. 332]; *Olcott* v. *Superior Court* (1945) 68 Cal.App.2d 603 [157 P.2d 36]). Julia's attorney has admitted her actual knowledge of the order and her deliberate disobedience.

*Disposition*

Let a writ of prohibition issue as prayed, preventing all further proceedings in the San Diego Superior Court as to child custody modification, other than contempt proceedings, as described below. The superior court shall entertain no further modification proceedings unless real party shall demonstrate unavailability of a suitable Idaho forum.

If Earl still desires to seek sanctions against Julia for contempt of our August 21 order, he may file an order to show cause in the superior court and may serve it on Julia's counsel in lieu of personal service. If he does so, then the superior court shall issue the order, set the matter for hearing, and take evidence as in any civil contempt procedure and shall order whatever sanctions appear appropriate.

Cologne, J., concurred.

**STANIFORTH, J.**—I respectfully dissent.

I

At bedrock is this proposition of law which controls our writ issuance: "[A] tribunal has jurisdiction to determine its own jurisdiction." (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 302 [109 P.2d 942, 132 A.L.R. 715].) And the appeal court does not interfere until the trial court has performed this threshold function. As the Supreme Court stated in *Rescue Army* v. *Municipal Court* (28 Cal.2d 460, 464 [171 P.2d 8]: "A court has jurisdiction to determine its own jurisdiction, for a basic issue in any case before a tribunal is its power to act, and it must have authority to decide that question in the first instance. It is necessary, therefore, to challenge the jurisdiction of the trial court *in that court* [italics in original], by demurrer, motion, plea or other objection of some kind, so that *that court* [italics in original] may prelim-

inarily decide the question whether it has jurisdiction to proceed. And unless a party can show that a lower tribunal, *after first determining that it has jurisdiction, is proceeding to exercise it* [italics in original], *there is nothing for a higher court to prohibit.* This obvious principle is one of the *cornerstones* of our system of lower and higher tribunals." (Italics added.) (See also *In re Marriage of Leonard* (1981) 122 Cal. App.3d 443 [175 Cal.Rptr. 903]; *Palm* v. *Superior Court* (1979) 97 Cal.App.3d 456 [158 Cal.Rptr. 786].)

The first California case to examine this concept in the context of a trial court's duties vis-à-vis the appeal court's function, *Abelleira* v. *District Court of Appeal, supra,* 17 Cal.2d at page 302, held: When the trial court has merely taken the question of whether it has jurisdiction under consideration, there is no reason for appellate interference pending its decision. The Supreme Court explained the roots of this rule: "It has its origin mainly in the cases holding that a court has inherent power to inquire into jurisdiction of its own motion, regardless of whether the question is raised by the litigants. [Citations.] It rests also upon the theory that until the court determines that it has jurisdiction and does some act in consequence, there can be no injury to the party who denies its jurisdiction. [Citation.] *It means only that the trial court or lower tribunal or body to which the question is submitted has such jurisdiction to make the first preliminary determination—not a final one; and no interference is permitted until it does decide the matter one way or the other. Until it acts to assume or refuse jurisdiction over the merits no one is entitled to complain.* (Italics added.)

"But once the tribunal, judicial or administrative, has made this determination of the issue, and has acted to assume jurisdiction of the cause, the rule no longer has any meaning. *The jurisdiction to determine jurisdiction has been fully exercised* by a determination in favor of jurisdiction over the cause; the question is no longer of jurisdiction to *determine,* but of jurisdiction to *act.* And jurisdiction to act is always a subject of inquiry by a higher court." (*Id.,* at pp. 302-303.)

This distinction was emphasized in *Rescue Army* v. *Municipal Court, supra,* 28 Cal.2d 460, 464-465: "When, however, the trial court has heard and determined the jurisdictional challenge, and has decided in favor of its own jurisdiction, and then proceeds to *act,* that is, *to try* the cause on its merits, the situation is entirely different. It then may be properly claimed that a court without jurisdiction is purporting to *exer-*

*cise it.* [Italics in original.] *At this stage, jurisdiction to determine jurisdiction has been exercised, and the higher courts will, in an appropriate case, restrain the lower court from acting in excess of jurisdiction* [citations]." (Italics added.) (See also *Housing Authority* v. *Superior Court* (1950) 35 Cal.2d 550, 557 [219 P.2d 457]; *Rich* v. *Superior Court* (1916) 31 Cal.App. 689, 694 [161 P. 291]; *Arroyo D. & W. Co.* v. *Superior Court* (1891) 92 Cal. 47, 52 [28 P. 54]; *Citizens Utilities Co.* v. *Superior Court* (1963) 59 Cal.2d 805, 814 [31 Cal.Rptr. 316, 382 P.2d 356], and cases cited.) And in *Sayegh* v. *Superior Court* (1955) 44 Cal.2d 814, 815 [285 P.2d 267]: "Ordinarily, a reviewing court will not grant prohibition until an objection to jurisdiction has been made *and overruled* in the lower court, since it is assumed that any valid objection properly brought to the attention of that court will prevail, and the writ will be unnecessary. (*Baird* v. *Superior Court*, 204 Cal. 408, 415 . . .; *Havemeyer* v. *Superior Court*, 84 Cal. 327, 406 . . .; *Hanrahan* v. *Superior Court*, 81 Cal.App.2d 432, 434-435; see *Rescue Army* v. *Municipal Court*, 28 Cal.2d 460, 464 . . .; [*Noland* v. *Superior Court* (1938) 26 Cal.App.2d 708 (80 P.2d 76); *Shaffer* v. *Justice Court* (1960) 185 Cal.App.2d 405, 408 (8 Cal.Rptr. 269)].)"

## II

The wisdom of the foregoing rule shines forth crying for application to the fact matrix here. The record reflects:

1. The marriage of these parties was dissolved in final decree of dissolution in the superior court, San Diego, January 5, 1978.

2. By agreement (Sept. 1977) the parties had "joint legal custody" of Dawn, then seven and Sarah, then five years old, but the father had "physical custody" with "liberal rights of visitation" reserved to the mother.

3. The mother (in 1980), without consent of the father, took the children from the father's home in Idaho.

4. On June 30, 1981, the mother pleaded no contest to the charge of child stealing in the San Diego Superior Court.

5. The mother (June 30, 1981) brought a petition in the superior court to modify the 1977 custody order.

6. Mr. Hafer responded in writing: "I consent to the following order: Reasonable visitation to Petitioner to occur in the presence of Respondent so as to avoid reoccurrence of child stealing."

7. On July 7, 1981, the husband filed his memorandum of law in the superior court proceeding, contending the California courts "lack jurisdiction to consider issues of child custody in this case."

8. A hearing was held in the superior court on that same day. The mother's attorney objected to the filing of the memorandum "received this morning" and asked for opportunity to file opposition points and authorities. The parties admitted the children were in California.

An argument by counsel then followed expressing the *legal contentions* of the respective parties. Counsel for the mother argued (a) there was evidence of "mistreatment and abuse" of the children over a three-year period and made reference to dental problems and failure to provide needed medical care. The mother's counsel also requested an interview with the children by the conciliation court counselor. The court, based on this preliminary discussion, observed "Mr. Hafer does not appear to wish to seek the services of the Idaho court—at least he has not done so as yet" and then concluded "I think in the best interests of the children this Court should assume jurisdiction at this point . . . ." The court then ordered the parties and children to see the conciliation counselor.

9. A further hearing (the same day) followed at which the counselor recommended a "full custody evaluation" and the mother keep the children until the end of August and then return them to the father in order to start school in Idaho.

The counselor also reported the girls (now ages seven and ten) told her they wanted to live with their mother "because the father is mean to them," uses switches, hairbrushes, hits them, punishes them by leaving them alone and sends them to bed for two to three hours.

The court then ordered a full term custody investigation and set the matter for hearing on October 30, 1981.

10. Mr. Hafer, in face of his written consent to the court's exercise of jurisdiction, petitioned this court for writ of prohibition, objecting to the

trial court's exercise of jurisdiction, contending it had no lawful basis under the UCCJA.

This court (the undersigned not participating) on August 21, 1981, in the context of yet unresolved factual issues presented by Mr. Hafer's challenge to jurisdiction, issued its order staying all proceedings and ordering the children returned to the father's custody "before August 24, 1981."

### III

At the epicenter of this melee of battling lawyers and angry parents are two small children who are being injured by this ongoing tug-of-war. Both children have serious health needs, both are being battered emotionally by the blind, the ungenerous, the unwise who in the name of love would destroy them. This is not the case for a California court to wash its hands of the whole unhappy affair.

Counsel for the mother has repeatedly made charges—but never in the proper forum—of child abuse. There has been no hearing on the preliminary issue of jurisdiction to hear the custody motion. The question for the purpose of jurisdiction is whether an emergency exists. If the children are being harmed in a medical sense by the father's lack of care, it should be so found by a superior court as a preliminary fact to assuming jurisdiction. A psychologist has represented by letter the children are being harmed in an emotional sense by a harsh cold father; these facts need be placed before the trial court in a proper hearing to determine jurisdiction.

If the father is cruel, so harsh in the treatment of the children as to cause them to express their desire not to live with him, this need be proven as fact. If such be the facts, then there exists express legislative authority for the superior court, San Diego, to accept jurisdiction and hear the custody petition.

Also, counsel for the mother has tendered conclusions and some few facts referent to the variety of substantial contacts these children have with San Diego, California. Again, these matters were *argued* at the July 7 hearing but never proffered in proper evidentiary form before a trier of fact.

In short, the basic evil with the processes which have thus far taken place—both at the trial court level and in the majority opinion—is that there has been no recognition of the absolute need for a factual hearing to determine the preliminary question of whether there is an emergency giving jurisdiction under UCCJA. The best interest of the children demand such a factual exploration in a proper jurisdictional *hearing* to determine whether emergency circumstances warrant an exercise of jurisdiction.

In face of the paucity of hard evidence before the trial judge, it must be conceded there is now no substantial evidence to support a finding of jurisdiction under the UCCJA. However, a wrong is permitted, where a host of reasonable suspicions of harm to the children have been raised. The trial judge had lawyer representations plus some hard facts from the counselor, who consulted at length with the children, which gave rise to a rational suspicion that the children were being neglected. This counselor, a disinterested, skilled person, requested a full custody investigation. This court, on these facts should remand the matter for an appropriate jurisdictional hearing. If it be found there is no emergency, no abuse, or maltreatment of the children, no basis for jurisdiction under the UCCJA exists; *then* these children should be returned to the father forthwith.

IV

My brethren also find the mother guilty of unclean hands. Whether her hands are "clean" depends upon the answer to this primary jurisdictional question: Is Mr. Hafer as bad a parent as is contended? The fact of the removal of a child without consent of the custodial parent does not ipso facto create unclean hands and lack of jurisdiction to determine custody. In child custody proceedings, the question of clean hands of the parents should be subordinated to the court's primary concern—the child's best interest. (*Bosse* v. *Superior Court* (1979) 89 Cal.App.3d 440, 444-445 [152 Cal.Rptr. 665]; *In re Marriage of Leonard, supra,* 122 Cal.App.3d 443, 466-468; see also *Woodhouse* v. *District Court, etc.* (1978) 196 Colo. 558 [587 P.2d 1199, 1200]; *In re Marriage of Verbin* (1979) 92 Wn.2d 171 [595 P.2d 905, 909, 910], *Williams* v. *Zacher* (1978) 35 Ore.App. 129 [581 P.2d 91, 96], *Nehra* v. *Uhlar* (1977) 43 N.Y.2d 242 [401 N.Y.S.2d 168, 372 N.E.2d 4, 8-9].) The Supreme Court of Washington reasoned: "We note, however, that even under section 8 of the Uniform Act [California Civ. Code, § 5157] our court would not have been required to decline jurisdiction. Section 8

contemplates consideration of all relevant facts and circumstances, and the exercise of discretion by the trial court to determine what is 'just and proper under the circumstances.' In this case respondent justifiably feared for the emotional well-being of her children as well as her own physical and emotional safety, if they stayed in the Maryland home. She fled to the comfort of her own parents and siblings, who were also able to extend security and love to her children. The trial court, in the exercise of its discretion, could well have found her conduct was not wrongful and did not require it to decline jurisdiction under the Uniform Act." (*In re Marriage of Verbin, supra,* 595 P.2d at pp. 909-910.)

The majority opinion suggests we confront purely a technical question of jurisdiction and therefore the court cannot look to the best interest of the children. Such concept is contrary to the express language of Civil Code section 5152, subdivision (1)(b), section 5156, subdivision (3), and to the patent inference to be drawn from the express language of section 5152, subdivision (1)(c)(ii), and contrary to scholarly authority and case law that teach us it is the best interest of the child which is paramount. (See Bodenheimer, *Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws* (1969) 22 Vand.L.Rev. 1207, 1221; *Clark* v. *Superior Court* (1977) 73 Cal.App.3d 298, 308-309 [140 Cal.Rptr. 709]; *In re Marriage of Ben-Yehoshua* (1979) 91 Cal.App.3d 259, 267 [154 Cal.Rptr. 80].)

In a most recent case, the balancing approach was used in determining whether to decline jurisdiction after mutual "child-stealing" incidents. (*In re Marriage of Leonard, supra,* 122 Cal.App.3d 443.) Under *Leonard,* "unclean hands" did not mandate a refusal of jurisdiction. The *Leonard* court refused to apply sanctions because it would not be in the best interest of the child. (*Id.,* at pp. 464-465.) It must be conceded that both the statute and the case law recognize that the imperative to discourage abduction must, when necessary, be submerged to the paramount concern in all custody matters: *the best interest of the child.* Otherwise "[t]he dignity of the several courts would be preserved, but the welfare of the children would be destroyed." (*Matter of Lang* v. *Lang* (1959) 9 App.Div.2d 401, 405 [193 N.Y.S.2d 763, 767], affd. 7 N.Y.2d 1029 [200 N.Y.S.2d 71, 166 N.E.2d 861].)

This case involves a collision of legal principles as well as the intransigence of the would-be custodians of these two hapless children, innocent subjects of a conflict they neither want nor can ever understand.

The guiding principle of the child's best interest is never easily applied once the parents themselves, as has happened in this case, have succeeded in creating the disruption of shifting custody. The court can only, as best it can, reduce the irreparable harm to a minimum.

The majority opinion effectively prevents the trial court from performing its mandated function of holding the necessary fact finding hearing to determine the validity—or invalidity—of the mother's claim to jurisdiction under the emergency rule (Civ. Code, § 5152, subd. (1)(c)(ii)), the "significant connection" rule (Civ. Code, § 5152, subd. (1)(b)), or as the decree state[1] and the factual issues tendered in opposition by the father: inconvenient forum and reprehensible conduct by the mother.

We confront here a charge of child abuse, undocumented but of sufficient prima facie weight to cause a most capable and sensitive trial judge—in face of admitted child abduction—to continue the children in the custody of the mother. Our concern for what must be the "paramount" issue in any child custody case—the best interest of the child—requires equal insight and concern. This matter should be remanded with direction to the trial court to determine the preliminary jurisdictional fact questions tendered.

---

[1]Although the "decree state" does not have exclusive jurisdiction to modify its decree as long as one parent continues to reside there and the state has not declined jurisdiction, there is a "preference" for the decree state. (See *In re Marriage of Leonard, supra,* 122 Cal.App.3d 443; Commissioners' Note to U.C.C.J.A., § 14 (Civ. Code, § 5163).)