[No. 25327-1-I. Division One. June 15, 1992.]

*In the Matter of the Marriage of* HELEN IERONIMAKIS,
*Respondent, and* MARKOS I. IERONIMAKIS,
*Appellant.*

*John Fox,* for appellant.

*Stephen Johnston,* for respondent.

FORREST, J. — Appellant Markos Ieronimakis, a citizen of Greece, appeals an award of custody of the two children born of his marriage to Helen Ieronimakis asserting that the court below lacked subject matter jurisdiction. We affirm the decree of dissolution, but reverse the custody decree finding the court lacked subject matter jurisdiction.[1]

FACTS AND PROCEDURAL HISTORY

Markos Ieronimakis was born in Greece and has lived there all of his life except for a period of time spent in the United States in the late 1970's. Helen Ieronimakis was born in Greece, but emigrated to North America when she was 8 years old, moving first to Canada and later settling with her parents in Seattle. Helen became an American citizen.

In the late 1970's Helen and Markos met in Seattle. They moved to Greece where they married on June 26, 1978. The two children who are the focus of this appeal, Iosif (Joseph)

---

[1] Markos also challenged the award of one-half the guardian ad litem fees. Since Helen has conceded this point we need not address the issue. It is unnecessary to discuss the reserved issues and Markos's other challenges in light of our disposition in this case.

and Nicolaos (Nicholas) were born in Greece. Joseph was born on April 22, 1979. Nicholas was born on April 29, 1980. The family resided in Greece, where Markos is employed, until the parties separated on August 4, 1987. On that day, and while Markos was at work, Helen took the children and flew to Seattle, where she and the children commenced to reside with Helen's parents. On the following day, August 5, 1987, Markos reached Helen by telephone. She told him that she did not intend to return the children to Greece. On August 11, 1987, precisely 7 days after arriving in Seattle, Helen filed a petition for dissolution of marriage in which she sought to be awarded the custody of Joseph and Nicholas.

In Greece, the parties experienced marital difficulties. Helen alleged in the proceedings below that Markos kept her and the children socially isolated, that he drank excessively, that he was physically abusive to her and the children, that he demanded she abort her third pregnancy, which occurred in 1986, and that although Markos had at one point agreed to allow her and the children to come to live in the United States, he also had threatened to have her deported and to keep the children from leaving Greece with her.

Although Markos limited his appearance in the proceedings below to the purpose of objecting to the court's jurisdiction in the custody proceedings, he submitted controverting affidavits and he did submit to an interview with the court appointed guardian ad litem.[2] In his interview with the guardian ad litem, Markos (through an interpreter) charged Helen with being the one who kept herself and the children isolated in Greece. He denied excessive drinking and he denied that he had ever agreed that Helen and the children could come to the United States to live, characterizing her departure from Greece with the children as a parental "kidnapping".

---

[2]Markos also sought, obtained and exercised rights of temporary visitation with the children in Seattle during the pendency of the proceedings below.

After Helen filed the petition for dissolution a show cause hearing for temporary custody was scheduled. Helen retained an attorney in Athens, Greece, for the purpose of serving Markos. On December 8, 1987, and while under the erroneous impression that Markos had been timely served with the appropriate King County court documents, Helen obtained a temporary custody order. The order was made subject to the subsequent filing of an affidavit of service, however.

Helen then learned that the attorney who had been retained to effectuate service upon Markos had failed to actually deliver the court documents to him. Instead the attorney had given Markos only a verbal notice of the Washington proceedings.

Meanwhile, on August 17, 1987, Markos commenced a child custody proceeding in Greece. The Greek court authorized telegram notice of those proceedings on Helen, but Helen maintains that she never received such a telegram and the record of the Greek proceedings which have been provided for this appeal contain no proof that such telegram notice was ever sent. A show cause hearing was set in Athens for August 27, 1987. On that day Markos obtained a temporary custody order in his favor. A trial date on the issue of permanent custody was scheduled for December 14, 1987.

On December 12, 1987, Helen was served with notice of the Greek court proceedings. She hired an attorney in Athens to appear on her behalf, and on December 14, 1987, that attorney obtained a continuance in the Greek trial date to February 1, 1988.

On January 19, 1988, Markos appeared in the King County dissolution matter, through retained counsel, he having been by then either personally served in Greece or he elected to appear in response to the verbal notice of the Washington proceedings. His appearance was stated to be for the limited purpose of contesting the jurisdiction of the Washington court with respect to the children's custody.

Markos has never filed a response to the petition for dissolution of marriage, and in fact he has declined to respond, relying instead on the jurisdictional challenge.

On February 1, 1988, the permanent custody trial took place in Greece. On February 18, 1988, a written decree was entered, awarding the children's custody to Markos. No visitation was provided for Helen. After reciting that Helen had surreptitiously removed the children from Greece and that Markos was a loving father, the Greek decree stated as follows:

> The interest of the minor children, for [their] correct [physical] and corporal development, imposes that the parental custody [of] them will be granted to their father and that they must be educated here, in Greece as [G]reek boys. The defendant [mother] has the intention to not come back never in Greece and to retain permanently the above mentioned minor children in America. Therefore the law-suit must be admitted as substantially . . . well founded . . ..

Helen then appealed the Greek custody decree to a higher court. According to documents from the Greek judicial authorities which were provided with the record for the appeal here in Washington, Helen was not required by Greek law to comply with the Greek trial court's order while her appeal in Greece was pending.

Meanwhile, between February and June 1988, a commissioner of the King County Superior Court communicated with the appropriate judicial authorities in Greece, inquiring about Greek substantive and procedural law in child custody matters. The commissioner received written assurances from the Greek authorities that Greece provides equal rights for women and that child custody decisions are based on the best interests of the child.[3]

On June 16, 1988, the commissioner entered an order in the Washington proceedings deferring jurisdiction to the Greek courts, stating that this ruling was in keeping with

---

[3]The dissent's distrust and criticism of the Greek judicial proceedings is somewhat surprising. In fact, even without the benefit of Helen's presence, the Greek courts reached the same conclusion as to custody that the dissent seems to believe could only properly be addressed by the Washington court.

the policies of the Uniform Child Custody Jurisdiction Act and forum non conveniens.

Helen timely sought revision of the commissioner's ruling. On July 13, 1988, the court appointed a guardian ad litem for the children (and a few days before that date the court also appointed Dr. Reichert, a behavioral and developmental pediatrician, to evaluate the children).

On September 25, 1988, while the Washington revision proceedings were still underway, Helen prevailed in her appeal of the Greek custody decree and received a ruling that the father would not have the children and that the children would remain in the United States.[4]

On November 14, 1988, after having received the written reports of the guardian ad litem and court appointed pediatrician, a judge of the King County Superior Court granted revision of the commissioner's ruling, and ordered instead that custody jurisdiction would be retained in Washington based on the "best interests of the children". Due to delays which appear to be the responsibility of both parties' counsel below, the written order granting revision was not entered until March 3, 1989. Markos then sought discretionary review of that order in this appellate court. Discretionary review was denied.

On November 13, 1989, after appropriate notice to Markos, a commissioner of the King County Superior Court entered an order of default, findings of fact, conclusions of law, decree of dissolution of marriage and a permanent parenting plan, by which the Ieronimakis marriage was dissolved and by which Helen was designated to be the

---

[4]At oral argument for the Washington appeal, the attorneys confirmed that Helen had at least temporarily prevailed on appeal in Greece. This court has not been provided with a copy of the Greek appellate court's order of September 25, 1988, but the order was referred to in Helen's civil appeals statement. Helen has not argued that the Washington appeal has become moot, and Markos has continued his vigorous prosecution of this Washington appeal. We assume that Markos has likewise appealed the order by which Helen appears to have at least temporarily prevailed in Greece. If there has been an ultimate and final decision in Greece since the time of oral argument, this court has not been advised of the outcome.

children's custodian and sole decision-making residential parent. The parenting plan provided Markos with up to 1 month of summer visitation with the children annually, to be exercised only in King County, upon advance notice to the mother. The visitation was limited to the daytime and was required to be supervised by a neutral third party. In order to protect the children from being returned to Greece during any such visitation, Markos was to be required to temporarily surrender his passport to a neutral third party during the duration of the visitation. The parenting plan further provided that upon Joseph reaching the age of 14 and Nicholas reaching the age of 13, the children may, if they desire, have a month of annual summer visitation with Markos in Greece, conditioned upon Markos's assurance that the children will be returned to the United States.

After hearing from the two attorneys with respect to the procedural history and the prior rulings on the jurisdictional issues of the case, a court commissioner (who had not previously been involved with the case) heard testimony from Helen. Helen testified as to the date of the marriage, as to the names and birth dates of the children, as to the period of the children's residency in Greece, as to her United States citizenship and as to the children's "green cards". She also testified that the children had (by then) resided in King County for 2 years, that the marriage was irretrievably broken, that she was able to support the children fully, and that Markos had provided no financial support for the children since separation.

The commissioner was also advised that the provisions of the parenting plan were based on the recommendations of the children's guardian ad litem, and that although Markos had Helen's current telephone number, he had made no effort to contact the children since March or April of 1989, a period of some 7 or 8 months.

The court commissioner then entered the findings and conclusions, parenting plan and decree of dissolution of marriage. This appeal was timely filed by Markos.

## SUBJECT MATTER JURISDICTION

■ Markos argues that jurisdiction should have been declined by the court in order to comply with the Uniform Child Custody Jurisdiction Act (UCCJA).[5] We agree. Helen contends the UCCJA does not apply to this proceeding because Greece is not a "state" as defined in RCW 26.27-.020(10).[6] This is clearly correct for certain provisions of the act such as RCW 26.27.060 dealing with simultaneous proceedings in other states. However, RCW 26.27.030[7] sets forth the jurisdiction requirement for the Washington court to try a child custody dispute. The petitioner has the burden to establish jurisdiction. The determination of jurisdiction

---

[5] RCW 26.27.

[6] " 'State' means any state, territory, or possession of the United States, the Commonwealth of Puerto Rico, and the District of Columbia."

[7] "(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if the conditions as set forth in any of the following paragraphs are met:

"(a) This state (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; or

"(b) It is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or

"(c) The child is physically present in this state and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

"(d)(i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (a), (b), or (c) of this subsection, or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.

"(2) Except under subsection (1)(c) and (d) of this section, physical presence in this state of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.

"(3) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody."

under subsections (1)(a), (b), and (c) is made without reference to whether Greece is included in the definition of "state". Only subsection (1)(d) involves the definition of "state" as a basis for jurisdiction. Helen did not rely on subsection (d) as a basis for jurisdiction. Reading the subsection literally, it is arguable that although Greece asserted jurisdiction, its not being a state as defined in RCW 26.27.020 means that the Washington court could assume jurisdiction. We are doubtful that in light of the purposes of the statute such result was the legislative intent. However, we prefer to rest our holding on the provisions of RCW 26.27.230:

> **International application.** The general policies of this chapter extend to the international area. The provisions of this chapter relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature to custody rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons.

Under this section the Washington court would give effect to custody decrees of foreign nations, including Greece, in the same manner they would to those of sister states. We need not decide whether the trial court should have given effect to the Greek decree at the time of the trial of this matter since we hold the court should not have assumed jurisdiction and since jurisdiction is to be determined as of the time an action is commenced.

■ What is the result of applying the "general policies of this chapter" to this international custody dispute? If this mother and these children had come from Puerto Rico, it could hardly be seriously argued that Washington should not decline in favor of Puerto Rico.[8] Applying the "general

---

[8]We do not find *In re Felix C.*, 116 Misc. 2d 300, 455 N.Y.S.2d 234 (N.Y. Fam. Ct. 1982) persuasive since, as the dissent acknowledges at 113, the Puerto Rican custody decree was obtained without proper notice. In any case, the New York court acknowledged that had the Puerto Rican court given the mother proper notice and Puerto Rican law allowed for examination of the children's best interests, the "court would reach a different conclusion." *Felix*, at 308 n.4.

policies" to these facts, the result should be the same. There is no question that if Greece was a sister state, it would be the "home state" and the proper place for the determination of custody. No persuasive reason has been urged for denying Greece the status of a "home state" except the restrictive definition of RCW 26.27.020 which we do not find to be controlling in light of RCW 26.27.230.

■ ■ Since Washington is clearly not the home state, jurisdiction must be found on the alternative bases of jurisdiction set forth in RCW 26.27.030. Apparently the trial court believed jurisdiction may be based on alternative subsection (b) because Helen and the children have a "significant connection" with Washington and there is substantial evidence concerning the children's best interests here. This analysis is unpersuasive because the facts which the trial court relied on in determining the jurisdiction question came into existence *after* the dissolution petition was filed. At the time the petition was filed all the relevant information was in Greece with the possible exception of a minor relationship with the maternal grandparents which could certainly have been presented to the Greek court.[9] The fact that there was substantial evidence concerning the children's care, protection, training, and personal relationships at the time of trial does not justify the Washington court taking jurisdiction.

To allow Washington courts to assert jurisdiction because Helen generated significant contacts with the state is in effect telling any abducting parent that if you can stay away from the home state long enough to generate new considerations and new evidence, that is a sufficient reason for the new state to assert a right to adjudicate the issue. Such a holding circumvents the intent of the jurisdiction laws.[10]

---

[9]*In re Marriage of Steadman*, 36 Wn. App. 77, 671 P.2d 808 (1983) is distinguishable since, as the dissent acknowledges at 104, there the court could not, and did not, address the significant connections test as it applies to children that have significant connections with a foreign state where substantial evidence exists concerning their care. It is also significant that in that case the foreign jurisdiction, Maine, declined to exercise jurisdiction in favor of Washington.

[10]"The [Parental Kidnaping Prevention Act of 1980] specifically establishes a home state priority by precluding use of the significant connection as a basis for

While there were allegations of mistreatment, none of which seemed overwhelming,[11] there is no showing that the Greek courts are incapable of protecting the children's interests. To the contrary, the superior court commissioner, prior to recommending the court decline jurisdiction, confirmed that the children's welfare would be safeguarded. The only other basis for ignoring the well-settled policies and allowing jurisdiction in Washington courts is the belief that the return of the children to Greece *at this point* would place them in an intolerable situation. Of course this argument addresses the custody issue which may only be considered after jurisdiction is established. Even if true, this situation results, of course, from events which have transpired *since* Helen abducted and gained sole control over the children[12] and should not be retroactively applied to control a decision as to jurisdiction. Even if the Greek court had awarded custody to the father, there is no reason to assume a total separation from the mother. Any such separation would only result from Helen's choice to put her own desires above her children's welfare by deciding not to live in Greece and not to visit Greece.

---

jurisdiction in the initial decree setting if there is a home state elsewhere that has not declined to exercise its jurisdiction. 28 U.S.C. § 1738A(c)(2)(B). The PKPA's explicit home state priority arose after several years of experience under the UCCJA indicated that the significant connection basis was being used by the courts as a loophole to exercise jurisdiction upon slight contact with the child." 2 Washington State Bar Ass'n, *Family Law Deskbook* § 47.6(3) (1989).

[11]The dissent, at 101, suggests there was "substantial evidence" of abuse but no party, or the dissent, suggests there was sufficient evidence of abuse to establish jurisdiction under RCW 26.27.030(1)(c) to protect the children. If the facts supported such a finding, which they do not, the UCCJA has provided an adequate mechanism to find jurisdiction and we should not manipulate the other provisions to accomplish this task. In any case, the dissent reaches its conclusion without the benefit of all the parties' versions of events and refuses to acknowledge the Greek courts could determine the true nature of the abuse after hearing from both parties.

[12]As the trial court recognized this raises a real opportunity for "brainwashing" the children. The conduct of the mother and maternal grandparents when the father was here suggest a ruthless effort to destroy the father/child relationship.

If the choice before this court truly was between the children with their father in Greece having no contact with Helen causing the undesirable rupture of their relationship with the mother; or the children with the mother in the United States having essentially no contact with Markos, it would be a much harder case. It appears that the trial court, and the dissent, believed it was faced with such an all or nothing choice. Fortunately, that is not the case before us. This court can apply the proper principle declining jurisdiction in favor of the home state recognizing that the Greek court likewise recognizes the importance of the children's relationship with their mother.[13]

One of the tragic consequences of the trial court's decision is that these children would be effectively denied any reasonable relationship with their father and would be cut off from their Greek heritage. Markos can only visit in a strange country, in the presence of a neutral supervisor, after surrendering his passport like a criminal on bail. Such restrictions might be appropriate for Helen's visitation in Greece since she has a proven record of abduction. Here they are totally inappropriate and unfair to Markos. Additionally, and more importantly, the restrictions would damage the children by preventing any normal relationship with their father and their Greek heritage.

Furthermore, since the Greek court has jurisdiction over both parents, a Greek decree may prove much more flexible and reasonable in attempting to have these children enjoy a significant relationship with both parents and with their Greek homeland. It would be an unacceptable precedent to reward the abducting parent without any substantial showing that such action is necessary to avoid threatened mistreatment and abuse of the children. Applying the "general policies" of the UCCJA to this dispute requires the Washington courts to decline jurisdiction.

---

[13]The dissent repeatedly makes the unwarranted assumption the Greek courts will not consider the best interests of the children, despite the direct assurances from Greek authorities. While the dissent freely criticizes the conclusions of the Greek trial decree, we think it somewhat ironical that the Greek Court of Appeals has awarded custody of the children to Helen and will allow them to stay in the United States.

DISCRETIONARY REASONS FOR DECLINING JURISDICTION

 Even if this court were to conclude that jurisdiction may be found under any of the provisions of RCW 26.27-.030, jurisdiction should have been declined on the basis of RCW 26.27.070 and RCW 26.27.080(1). The doctrine of forum non conveniens has been codified into the UCCJA at RCW 26.27.070 and provides that even where a court has jurisdiction, it should decline to exercise jurisdiction under certain circumstances. Many of the factors intended to determine if a forum is inconvenient merely repeat the home state and significant connection tests of jurisdiction.[14] As discussed above, Greece was the home state, had the most significant connection with the family and had the most substantial evidence of the children's welfare at the filing of this action. The exercise of Washington jurisdiction violates the home state preference and thus defeats the purposes stated in RCW 26.27.010.

Likewise, RCW 26.27.080(1)[15] specifically addresses the facts of this case. When the petitioner for an initial decree has wrongfully taken the child from its home state the court may decline jurisdiction. To hold otherwise would create a double standard, establishing different rules for "good abductions" and "bad abductions". But this court cannot

---

[14]RCW 26.27.070(3) provides that:

"In determining if it is an inconvenient forum, the court shall consider if it is in the interest of the child that another state assume jurisdiction. For this purpose it may take into account the following factors, among others:

"(a) If another state is or recently was the child's home state;

"(b) If another state has a closer connection with the child and his family or with the child and one or more of the contestants;

"(c) If substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state;

"(d) If the parties have agreed on another forum which is no less appropriate; and

"(e) If the exercise of jurisdiction by a court of this state would contravene any of the purposes stated in RCW 26.27.010."

[15]"**Jurisdiction declined by reason of conduct.** (1) If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in similar reprehensible conduct the court may decline to exercise jurisdiction for purposes of adjudication of custody if this is just and proper under the circumstances."

condone Helen's conduct, no matter how well intentioned, when it presents a deliberate frustration of Markos's rights and an attempt to select the forum for the custody dispute contrary to the statutory policies. The exercise of jurisdiction contravenes the strict policy to deter abductions and other self-help measures undertaken to obtain custody.[16]

### HAGUE CONVENTION

We find additional support for this conclusion in the recently adopted Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention).[17] Article 1 of the convention provides as follows:

The objects of the present Convention are —
[a] to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and
[b] to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.

Although the convention does not directly control the instant matter[18] it is a clear manifestation of this country's national policy to discourage abductions and encourage home-state jurisdiction. Although somewhat more generous and flexible in allowing a nation's courts to assume jurisdiction of an international custody dispute, there is a surprisingly good fit between the purposes and provisions of the UCCJA and the Hague Convention. Our interpretation and application of the general language of RCW 26.27.230 apply-

---

[16] "'Abductions and reabductions of children remains perhaps the most serious problem confronting practitioners and the courts, not to mention the child, the innocent victims of the ongoing struggle between embattled and embittered parents.'" *Goodman v. Goodman*, 383 Pa. Super. 374, 391-92, 556 A.2d 1379, 1388 (1989) (quoting 4 J. McCahey, M. Kaufman, C. Kraut & J. Zett, *Child Custody & Visitation Law and Practice* § 4.08[1], at 4-150 (1988)).

[17] The Hague Convention may be found as Sen. Treaty Doc. 99-11, 99th Cong. 1st Sess. (1985) and at 51 Fed. Reg. 10498-10502 (1986).

[18] The United States ratified the Hague Convention on April 29, 1988. Implementing legislation became effective on July 1, 1988. 42 U.S.C. §§ 11601-11610. Greece, however, had not ratified or implemented the Hague Convention at the time of the proceedings below, nor at the time this case was briefed and argued on appeal.

ing the general policies of the UCCJA to international custody disputes is in harmony with the provisions and purposes of the Hague Convention.

The judgment of a trial court assuming jurisdiction of this custody dispute and award of guardian ad litem fees is reversed, in other respects the decree of dissolution is affirmed. The trial court shall, however, retain jurisdiction to enter appropriate orders implementing the current Greek custody decree and specifically to arrange for a transfer of custody if such transfer is required by the Greek decree.

SCHOLFIELD, J., concurs.

KENNEDY, J. (dissenting) — I respectfully dissent. The King County Superior Court did not lack subject matter jurisdiction over this international custody dispute. Nor was the court required to decline jurisdiction under the doctrines of forum non conveniens or clean hands. Moreover, and contrary to the conclusion of the majority, its decision is most definitely *not* in harmony with the purposes of the Hague Convention.

SUBJECT MATTER JURISDICTION

1. International Application.

RCW 26.27.230 provides as follows:

> The general policies of this chapter extend to the international area. The provisions of this chapter relating to the recognition and enforcement of custody decrees of other states apply to custody decrees . . . rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons.

Clearly, if the issue is recognition and enforcement of a foreign custody decree, this section means that RCW 26.27-.130, .150, and .160 apply to the proceeding if the foreign decree was entered after reasonable notice and opportunity to be heard.[19] Had the Legislature intended that subject

---

[19]Markos is not seeking to enforce a Greek custody decree, rather, he is challenging the jurisdiction of the Washington courts to make an initial custody

matter jurisdiction over international custody disputes is to be determined pursuant to RCW 26.27.030, presumably the Legislature would have so stated, just as it did with respect to recognition and enforcement of foreign custody decrees. Instead, the Legislature adopted § 23 of the uniform act. *See* Uniform Child Custody Jurisdiction Act § 23, 9 U.L.A. 326-27 (1988).

Accordingly, it would appear that our Legislature intended this section on international application to be interpreted in accord with the comment following § 23 of the uniform act:

> The first sentence [of § 23] makes the general policies of the Act applicable to international cases. This means that the substance of section 1 [RCW 26.27.010, Purposes of chapter] and the principles underlying provisions like sections 6 [RCW 26.27.060, Simultaneous proceedings in other states], 7 [RCW 26.27.070, Inconvenient forum], 8 [RCW 26.27.080, Jurisdiction declined by reason of conduct], and 14(a) [RCW 26.27-.140(1), Modification of custody decree of another state], are to be followed when some of the persons involved are in a foreign country . . ..

9 U.L.A. 326-27. Notably absent from this explanation of the meaning of the first sentence of § 23 is any reference to § 3 of the uniform act, the section found at RCW 26.27.030, entitled Jurisdiction.

The initial question before this court is whether RCW 26.27.030 governs the issue of subject matter jurisdiction in Washington over the custody of Joseph and Nicholas. If so, neither the Washington Legislature in adopting the uniform act, nor the National Conference of Commissioners in drafting and explaining the uniform act, have so stated. This is a glaring omission, if indeed it was intended that RCW 26.27.030 would govern; so glaring is the omission that I can only conclude that section .030 does *not* govern the question of subject matter jurisdiction over international custody disputes. Rather, the general purposes of the act as set forth in section .010 and the doctrines of forum non conveniens and clean hands, as set forth in sections .070

---

determination. Therefore, only the first sentence of RCW 26.27.230 applies to this proceeding.

and .080, must guide the Washington courts in the exercise of their discretion of whether to *retain* jurisdiction over an international custody dispute. If subject matter jurisdiction over an international custody dispute exists pursuant to RCW 26.09, the marital dissolution chapter, that jurisdiction will not be abrogated by any provisions of RCW 26.27, the Uniform Child Custody Jurisdiction Act (UCCJA), except in the case of a petition filed in Washington after a petition has been filed in a nation having concurrent jurisdiction *and exercising that jurisdiction substantially in conformance with the act.* RCW 26.27.060(1).

In addition to being guided by the above statement of intent of the drafters of the uniform act, we should be guided by the normal rules of statutory construction, with respect to this issue of subject matter jurisdiction over an international custody dispute. Where a statute specifically designates the things upon which it operates, there is an inference that the Legislature intended all omissions. *See, e.g., Kreidler v. Eikenberry*, 111 Wn.2d 828, 835, 766 P.2d 438 (1989) (express mention of one thing implies exclusion of another). Therefore we can infer that because the Legislature specifically made the provisions of the chapter which govern recognition and enforcement of decrees of other states applicable to the decrees of other nations, while otherwise extending only the "general policies" of the chapter to international custody disputes, the Legislature did not intend that RCW 26.27.030 would govern the issue of subject matter jurisdiction with respect to international custody disputes.

This construction makes sense, both in terms of the normal rules of statutory construction and in terms of the best interests of children, not all of whom may be brought to Washington from a foreign country which recognizes that women and children are not chattels.[20]

---

[20]The Hague Convention was intended to govern jurisdiction over international custody disputes. The Hague Convention, in article 16, specifically addresses jurisdiction in a situation where to return a child to his home nation would present a grave risk of psychological harm to the child or otherwise place the child in an intolerable situation. See discussion *infra*.

My conclusion is that although the Legislature intended the provisions of sections .130, .150, and .160 to apply in the international area, section .030 was not intended to govern the issue of subject matter jurisdiction over international custody disputes. That jurisdiction either is or is not present, pursuant to RCW 26.09. If it is, then the court is to look first to the provisions of RCW 26.27.060 and if no other petition is pending as therein provided the court must then look to the provisions of RCW 26.27.010, .070, and .080 and be guided by the principles underlying those provisions in exercising its sound discretion. The court is thus to determine, in the exercise of its sound discretion, whether to exercise its jurisdiction or whether to defer to the concurrent jurisdiction of the foreign nation.[21]

In the proceeding below, the court commissioner so understood, and, after hearing from the Greek judicial authorities, decided to defer to the concurrent jurisdiction of Greece.[22] Upon motion for revision, and following a much more thorough inquiry, the superior court judge declined to so defer and ruled as a matter of law that the UCCJA did not dictate otherwise. Both the court commissioner and the revising judge clearly understood, as the majority of this panel does not, that there is subject matter jurisdiction in Washington and the real issue is whether to exercise that jurisdiction, or whether to defer to the concurrent jurisdiction in Greece, even though the Washington petition was the first to be filed, based on the doctrines of forum non conveniens or clean hands, and most importantly of all, based upon which of the competing forums was prepared to address *and was actually addressing* the best interests of Joseph and Nicholas.

---

[21]Where both countries which are involved have ratified the Hague Convention, the convention must also be considered. In this case, the Hague Convention does not apply. Although the United States has ratified the convention, insofar as is relevant to this appeal, Greece has not.

[22]Here, Helen's petition was the first to be filed, so RCW 26.27.060(1) does not require that the Washington proceeding be stayed. Further, by the time of the revision hearing it was apparent that Greece was not proceeding "substantially in conformity with this chapter". *See* RCW 26.27.060(1) and discussion *infra*.

Subject matter jurisdiction became vested in Washington when Helen *lawfully* removed the children from Greece and brought them to Washington, where she established a domicile for herself and for the children who were lawfully in her custody and when Helen thereafter petitioned the court for marital dissolution and for custody of the children, prior to the time that Markos commenced the proceeding in Greece. *See* RCW 26.09.030; RCW 26.27.060; *In re Burns*, 194 Wash. 293, 77 P.2d 1025 (1938); *In re Marriage of Myers*, 92 Wn.2d 113, 594 P.2d 902 (1979); *In re Marriage of Saucido*, 85 Wn.2d 653, 538 P.2d 1219 (1975); *In re Marriage of Verbin*, 92 Wn.2d 171, 595 P.2d 905 (1979).

Although the majority characterizes Helen's unilateral decision to remove the children from Greece as "wrongful" and as an "abduction", majority opinion, at 92, 93-96, it is neither "wrongful" nor an "abduction" to remove one's children from an abusive situation and to reestablish them in a place of safety, unilaterally or otherwise.[23] Helen violated no court decree in removing these children from Greece. That her decision was unilateral, *i.e.*, that the children were removed without prior notice and while Markos was at work, is certainly understandable. There is substantial evidence that Helen and both children had been abused physically by Markos and that, although Markos had on some occasions told Helen to take the children and get out, on other occasions Markos had threatened to have Helen deported and to keep the children from her. These issues go more to the discretionary determinations which were before the Superior Court than they do to the issue of subject matter jurisdiction and I will discuss them in more detail later in this opinion. But there is also a relationship to subject matter jurisdiction in that a parent may not obtain subject matter jurisdiction in this state under RCW 26.09 by removing a child in violation of a valid court decree.[24] In

---

[23]*Webster's Third New International Dictionary* 3 (1976) defines "abduct" as "to carry (a person) off by force : lead (a child) away wrongfully".

[24]Compare RCW 26.27.030(1), .080(2), .130, and .140(1) and (2). Where the UCCJA governs the issue of subject matter jurisdiction, rather than RCW 26.09

that instance, the child may be "found in Washington" but the child is not legally "domiciled" in Washington. *See, e.g., In re Marriage of Saucido*, 85 Wn.2d at 653, 659. Helen violated no such court decree. She and the children were legally domiciled in Washington. The Superior Court had subject matter jurisdiction pursuant to RCW 26.09.

2. Subject Matter Jurisdiction and the UCCJA.

Even if the majority were correct in its conclusion that RCW 26.27.030 governs the issue of subject matter jurisdiction in this international custody dispute, the superior court had subject matter jurisdiction over the custody of these children pursuant to RCW 26.27.030(1)(b), which provides that the superior court has jurisdiction to make a child custody determination by initial decree if

> (b) *It is in the best interest of the child* that a court of this state assume jurisdiction because (i) the child and his parents, or *the child and at least one contestant, have a significant connection with this state*, and (ii) there is available in this state substantial evidence concerning the child's *present or future care, protection, training, and personal relationships*; . . ..

(Italics mine.)[25] Subject matter jurisdiction under this section is sometimes referred to in the case law and literature as "best interest jurisdiction".

---

alone, subject matter jurisdiction *may* be acquired even if the child is brought into Washington or retained in Washington in violation of the decree of a sister state (so long as the Parental Kidnaping Prevention Act of 1980 (PKPA), 28 U.S.C. § 1738A, does not otherwise preempt the issue). *See also In re Marriage of Verbin, supra.*

[25]It should be pointed out that Markos has not argued on appeal that the Parental Kidnaping Prevention Act of 1980 (PKPA), 28 U.S.C. § 1738A, is applicable to these proceedings, and indeed an examination of that act reveals that it is not applicable to international custody disputes. *See also Dare v. Secretary of Air Force*, 608 F. Supp. 1077 (D. Del. 1985), *aff'd*, 787 F.2d 581, *cert. denied*, 479 U.S. 846, 93 L. Ed. 2d 104, 107 S. Ct. 166 (1986) (PKPA not applicable to mother's effort to enforce Delaware family court decree through military authorities where father refused to obey state court's order to return child from Clark Air Base in Republic of the Philippines where father stationed. The Philippines is a sovereign nation and not a "state" as defined in the PKPA). The definition of "state" in the PKPA is the same as the definition of "state" in the UCCJA. *See* 28 U.S.C. § 1738A(b)(6) and RCW 26.27.020(10).

Significant Connections Test

The majority brushes off the issue of Helen's and the children's significant connection in Washington by ignoring Helen's significant connection altogether and by characterizing the children's significant connection as only "a minor relationship with the maternal grandparents". Majority opinion, at 92. This is an unfair and unwarranted representation of the evidence in the record. The record clearly demonstrates that both Helen and the children have strong family ties in Seattle which were in place long before Helen brought the children to Seattle and instituted this custody proceeding.

Helen had lived in Seattle from early in her childhood and until her marriage to Markos. She had attended Shoreline Community College and the University of Washington before her marriage to Markos. Her parents and siblings still reside in Seattle. As for Joseph and Nicholas, in addition to their maternal grandparents these children have three uncles and a number of aunts and cousins in the Seattle area. Prior to this proceeding the children had spent their entire summer vacation in Seattle in alternating years and Helen's family had visited her and the children in Greece nearly annually. From the record it appears that the children had spent 3 full months of summer vacation in Seattle four different times, *i.e.*, these children each had spent 12 full months of their young lives in Seattle. Helen's extended family is closely knit and stable and Joseph and Nicholas have been an integral part of that extended family since their births.

Division Two of this court has concluded that the presence of "several supportive family members" establishes a "significant connection" with the state as that term is used in RCW 26.27.030(1)(b). *See In re Marriage of Steadman*, 36 Wn. App. 77, 79-80, 671 P.2d 808 (1983). I agree. In *Steadman*, the petitioning wife, Susan Steadman, had been born and raised in Washington and her mother and most of her family resided here. Ms. Steadman went to Maine in 1976, when she was 18 years old, to visit an aunt. There she met and married Mr. Steadman. The couple resided in Maine.

Their child was born there in 1979. Shortly after the child's birth the parties separated. Susan Steadman immediately returned to Washington with the infant child, where she immediately petitioned for marital dissolution and custody of the child. Mr. Steadman thereafter commenced custody proceedings in Maine and challenged the Washington court's jurisdiction under the UCCJA. Although the *Steadman* court was only required to construe the term "significant connection" with respect to Ms. Steadman, there having been no challenge to the trial court's finding that the infant child shared in the mother's significant connection, it logically follows that a child of such tender years *would* share in his parent's supportive family ties in this state.

In this case of Ieronimakis, however, the children themselves were old enough to have developed their own significant personal relationships with their supportive family members here in Washington and it is clear from the record that Joseph and Nicholas had in fact developed those ties long before this action was filed. The majority has sought to distinguish *Steadman*, in part by characterizing the children's relationship with their maternal grandparents as a "minor relationship" of no particular significance or importance in the lives of these children.

The best evidence of the significance and importance *to the children* of these family relationships is found in the reports of the guardian ad litem, Ms. Gompf, and the court appointed evaluating pediatrician, Dr. Reichert.[26] Joseph, then age 9, was asked by Dr. Reichert to name the most important people in his life. He named his mother, his brother Nicholas, his maternal grandmother, his maternal grandfather, his three maternal uncles, all of whom reside in Seattle, and three school chums in Seattle. Nicholas, then age 8, responded to the same question in a separate interview by identifying his mother, his brother Joseph, his maternal grandparents, his three maternal uncles in Seattle and some friends at his school in Seattle.

---

[26]Dr. Reichert specializes in child behavior. Ms. Gompf is an attorney.

When the children were asked by the guardian ad litem with whom they felt safe, each of them identified his mother, his brother, his maternal grandparents and his maternal uncles in Seattle.

Significantly, although the boys had lived with their father for almost all of their lives and although they had often visited with their paternal grandparents (during the summer in alternating years) in Crete, neither their father nor any of their paternal relatives was identified by these children as among the most important people in their lives or even as people with whom they felt safe. Instead, when Joseph was asked by Dr. Reichert whether he would like to live with his father, Joseph spontaneously burst into tears. Joseph had a similar response when Dr. Reichert asked if he would like to visit his father and his paternal relatives in Greece. Nicholas, when he was asked these same questions by Dr. Reichert expressed fear for his own safety and concern that his paternal grandfather might hide him away in Crete.[27]

Although each child wished to continue to have a relationship with his father, each child simply wanted to visit with his father *in Seattle*.[28]

The significant connection test recognizes the socioeconomic realities of the lives of women and men. Helen, as is true of many married women, was totally economically dependent upon her husband Markos. When the marriage failed, Helen did what most women in her situation would do. She returned to her family. She could not otherwise

---

[27]Although the majority apparently suspects that the children's responses to these inquiries were the result of "scripting", both Dr. Reichert and the guardian ad litem reported that they did not believe this to be the case. Although the revision judge recognized the *potential* for scripting in these kinds of matters the judge did not find that scripting had occurred here. The failure to make a finding on a litigated issue (and this issue was litigated below) is the equivalent of a finding against the party who bore the burden of proof of that issue. Here, Markos raised the issue and it was his burden of proof. *See, e.g., Taplett v. Khela*, 60 Wn. App. 751, 760, 807 P.2d 885 (1991).

[28]That each child wished to continue to have a relationship with his father, albeit from a position which each child considered "safe", belies the allegation of "scripting".

survive economically and she enjoyed a close relationship with her family.

As is reflected in the reports of the guardian ad litem and the court appointed evaluating physician, Helen and the children were closely bonded. Markos and the children were not nearly as closely bonded. Not only had Helen always served as the children's primary caretaker but also there was a history of physical abuse of Helen and the children by Markos.[29] Although the majority makes light of the domestic violence which Helen alleges occurred in Greece, both children confirmed that they themselves had been physically abused by their father and they did so in their own individual words, in separate interviews with both Dr. Reichert and the guardian ad litem, neither of whom doubted that the children were being truthful. As night follows day, under these circumstances it was to be expected that when Helen left Greece she would return to her family in Seattle *and* she would bring the children with her. Markos clearly understood this, for he reached Helen by calling on the telephone to her parents' home on the day following her departure with the children.

RCW 26.27.030(1)(b) was intended to preserve subject matter jurisdiction for exactly such circumstances as these. The *Steadman* court correctly understood the significant connection test. The majority of the panel in the instant appeal apparently does not understand the test, or perhaps it is the evidence in this case which has not been fully understood.

## Substantial Evidence Test

The significant connection test does not stand alone. It relates back to the question of whether it is in the best interest of the child that a court of this state assume jurisdiction *because* the child and at least one contestant have a significant connection with this state *and because* there is substantial evidence in this state concerning the child's

---

[29]Contrary to the assertion of the majority at page 93 n.11., Markos was heard from and did generally deny the allegations of physical abuse. Markos submitted several affidavits and he was personally interviewed by the guardian ad litem.

*present or future*, care, protection, training and personal relationships. RCW 26.27.030(1)(b). This is so, even though the child's home state is elsewhere and even though the child may and in most cases will also have a significant connection with the home state. There also may be substantial evidence, inclusive of evidence of the child's *past* care, protection, training and personal relationships, in that home state. Subject matter jurisdiction is not lost merely because there is a home state from which the child recently has been removed, even unilaterally, by one parent, while the other parent remains in the home state, so long as proceedings substantially in conformity with the act have not yet commenced in the home state. *Both* states may have subject matter jurisdiction, in which event the state first asserting its subject matter jurisdiction will proceed, unless the court of that state determines to stay its proceeding because the other state is the more appropriate forum. RCW 26.27.060, .070. Such a determination will be discretionary, however, and not mandatory. RCW 26.27.070, .080.

The majority appears to have confused apples with oranges, so to speak, by confusing subject matter jurisdiction with the *discretionary* determination of whether to exercise that jurisdiction or whether to defer to the *concurrent* subject matter jurisdiction of the home state. Washington clearly has subject matter jurisdiction in this case pursuant to RCW 26.27-.030(1)(b) (as well as RCW 26.09). Greece clearly has *concurrent* subject matter jurisdiction based upon its own laws as to jurisdiction.[30]

Even if the majority were correct in its analysis that RCW 26.27.030(1)(b) must be applied based on significant connec-

---

[30]Greece, however, insofar as the record before this court reveals, does not recognize any doctrine equivalent to forum non conveniens. Instead, under Greek law, Article 622, entitled International Jurisdiction, "[t]he Greek courts have jurisdiction over any legal proceedings . . . if the father or the mother or the child are Greek citizens even if at the present time they do not live or reside in Greece *nor they had ever lived or resided in Greece in the past*". (Italics mine.) Foreign judgments are enforceable in Greece *if, on the basis of Greek laws*, the court in the foreign country where the decision was initially issued did have jurisdiction *and* the decision does not contradict any decision by the Greek court on the same case.

tions and substantial evidence in existence *before* the custody petition is filed, as opposed to later when the superior court is asked to make its determination, in this case the Washington courts do have the requisite subject matter jurisdiction. In this case the significant connection and most of the relevant substantial evidence were in place before the children were removed from Greece.

In the instant matter, the only relevant evidence which actually was developed after the filing of the petition in Washington was the evidence that both boys were happily integrated into their new home and school settings, that each boy had made friends at school whom he counted among the most important people in his life, and that each child had become bilingual (in that each spoke only Greek before entering school in Seattle, whereas by the time of the revision hearing each child was proficient in English as well as in Greek). Even this evidence, although it developed during the year which intervened between the filing of the petition and the ruling on revision, was relevant evidence in this state concerning the children's present and future care, protection, training and personal relationships.[31] *See Hudson v. Hudson*, 35 Wn. App. 822, 830-31, 670 P.2d 287 (1983):

> The significant connection test requires more than a strictly quantitative analysis. The [UCCJA] was designed to place the issue of custody in the forum most appropriate to determine the best interests of the children. As explained by the reporter for the Uniform Act who is recognized as a leading authority on its provisions: "the most significant evidence will have to come from the parents themselves . . .." The Act is expressly concerned not only with the past care of the children, but with their *present* and *future* care. *To this extent, the forum should have access to information concerning the effect on the children of materially changed circumstances.*

(Citations omitted. Some italics mine.)

If a child has a significant connection in the state where "best interest jurisdiction" is invoked, because of a loving,

---

[31]Furthermore, the delay between the filing of the petition and the eventual ruling on the motion for revision is attributable to *both* parties. Neither Helen alone nor the children should be penalized for the delay.

closely knit and stable extended family located there, there is also likely to be available in that state substantial evidence concerning the child's present or future care, protection, training and personal relationships, because of the very nature of those close family ties. It is so in this case.

There was also present in this state, before the petition was filed, ample evidence that if the ultimate custody decision were to be made in Helen's favor, the children need not be deprived of their proud Greek heritage. As the majority properly recognizes, that heritage is important to the children's past, present and future care and development. What the majority fails to recognize is that these children are not in an "either/or" situation with respect to their Greek heritage. Helen shares that same proud heritage, as does her extended family in Seattle. That Seattle is blessed with a thriving Greek community is well known to the courts of this area and to all knowledgeable persons who reside in this area. The record reflects that Helen's extended family (whose surname is Nicoloudakis) has always been actively involved in its Greek heritage. One of the witnesses who was interviewed by the guardian ad litem was Rev. Fr. A. Homer Demopulos, the pastor of St. Demetrious Greek Orthodox Church in Seattle. Father Demopulos had been the pastor at that church for 15 years and he had known Helen's extended family for all of those years because of their involvement and activity in their Greek Orthodox religion and in Seattle's Greek community.

Helen herself was raised in Seattle strictly in accord with traditional Greek values. She was chaperoned by her family during her courtship with Markos and Markos was required to ask Helen's father for Helen's hand in marriage.

As the record makes clear, there is substantial evidence in Washington not only of the children's American heritage but also of their Greek heritage and this evidence was in place long before the children were born, not to mention long before Helen filed the instant proceedings.

It was not inappropriate for the Superior Court to appoint the guardian ad litem and evaluating pediatrician for the

purpose of *independently* advising the court with respect to the factors which the court was required to consider under RCW 26.27.030(1)(b). Nor was it inappropriate for the court to consider the information provided by those court appointees *for the purpose of determining whether these children and one contestant had significant contacts in Washington and whether there was substantial evidence in this state as to the children's present and future care, protection, training and personal relationships.*[32]

Notably, RCW 26.27.030(1)(b) does not require that there be substantial evidence available in this state concerning the children's *past* care, protection, training and personal relationships. Washington is not the children's "home state" as defined by the UCCJA. *See* RCW 26.27.020(5). Nevertheless by its very terms, the act contemplates that subject matter jurisdiction may exist, outside of the "home state".[33]

Although I agree with the majority that jurisdiction pursuant to the UCCJA is to be determined as of the time an action is commenced, it does not necessarily follow that the facts relied upon by the Superior Court in determining jurisdiction in this case came into existence *after* the petition was filed or that such facts as were developed after the petition was filed are not relevant to the question of best forum. RCW 26.27.030(1)(b)(ii) requires the court to determine whether there is substantial evidence available in this state concerning the child's present or future care, protection, training and personal relationships.

As was recognized by Division Two of this court in *Hudson v. Hudson*, 35 Wn. App. at 831:

---

[32]Although the reports of the guardian ad item and court appointed evaluating pediatrician contained information which also was relevant to the ultimate determination of the custody issue, I find no indication in the record that the revision judge confused the issue of "best parent" with the issue of "best forum".

[33]The provisions of RCW 26.27.030(1) are written in the disjunctive. The State may assert subject matter jurisdiction if it is the home state *or* if it is in the best interest of the child for the State to assume jurisdiction because of significant connections and substantial evidence *or* if any one of the other stated bases for subject matter jurisdiction is present.

"[T]he most significant evidence will have to come from the parents themselves, from other persons who might be entrusted with the care of the child, and from those who can testify about the competence of these persons as custodians."

The *Hudson* court was quoting Bodenheimer, *The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws*, 22 Vand. L. Rev. 1207, 1223 (1969).[34] As the *Hudson* court also recognized, in a situation where one parent removes the children to that parent's former home state where her parents and other significant family members reside, while the other parent remains in the children's home state as defined in the act, *both* states may have substantial evidence — the home state as to the children's past care and the state to which the children have been removed as to the children's present care and their future care. Witnesses in *each* state may have relevant information with respect to each of the potential custodians. In such cases "it will be difficult to decide which state has more of the relevant evidence." *Hudson*, 35 Wn. App. at 832 n.9 (quoting Bodenheimer, at 1222-23).

Both states will have subject matter jurisdiction in these circumstances but under the act jurisdiction will not be exercised in both states. Rather, the case will proceed in the state where the petition is first filed, RCW 26.27.060, *unless* that state declines to exercise its concurrent jurisdiction pursuant to RCW 26.27.070 (inconvenient forum) or RCW 26.27.080 (jurisdiction declined by reason of conduct). *See also* Uniform Child Custody Jurisdiction Act § 3 comment, 9 U.L.A. 144-45 (1968).

In this case, it should be noted that there also was available in Washington significant evidence as to the children's *past* care, protection, training and personal relationships simply because " 'the most significant evidence will have to come from the parents themselves," *Hudson*, 35 Wn. App. at 831, and, one might add, given the ages of these children, from the children themselves through their court appointed representatives, the guardian ad litem and the evaluating pediatrician.

---

[34]Bodenheimer is recognized as a leading authority on the UCCJA.

DISCRETIONARY DETERMINATIONS OF THE
SUPERIOR COURT

Once subject matter jurisdiction is established, as it was here, the question then arises of whether to exercise that jurisdiction or whether to defer to the concurrent jurisdiction of the "home state", or, in this case, whether to defer to the concurrent jurisdiction of the home nation, Greece.

With respect to this decision, the issue is not which of two competing parents is the best parent but rather which of two competing forums is the best forum to determine the all-important issue of the best interest of the child. Although the majority concludes, at page 93 of its opinion, that there was no showing that the Greek courts were *incapable* of determining the children's best interests, the real question, by the time of the revision hearing, was whether the Greek courts were actually doing so. There was an ample showing that the custody determinations which were being made simultaneously in Greece were based on the alleged blemishes on the characters of the respective parents rather than on the needs of Joseph and Nicholas. Indeed, although these children are closely bonded to their mother, Helen was not awarded any visitation rights in the Greek decree from which she appealed. Nor had the Greek courts made any effort to investigate the children's wishes and needs with respect to the issues of custody and visitation.

In the initial, ex parte order granting temporary custody to Markos, the Greek court determined that Markos should have temporary custody in part because Helen was "peevish and quarrelsome" from the first days of the marriage and "what she was interested in and what she admitted was constant demands, unbearable pressure for the purchase of land and country houses . . .". After Markos was awarded the children's permanent custody following the trial in Greece, Helen appealed and apparently prevailed, at least temporarily, on the basis of pleadings which focused almost entirely upon Markos' shortcomings as a husband.

At page 91 of the majority opinion, it is stated that "[i]f this mother and these children had come from Puerto Rico, it could hardly be seriously argued that Washington should not decline in favor of Puerto Rico." The majority goes on to argue that if Greece were a "state" as is Puerto Rico for the purposes of the UCCJA, Greece would be the " 'home state' and the proper place for the determination of custody." Majority opinion, at 91-92. I disagree with the majority's conclusion that if we were dealing with a case identical to this one in every respect except that the mother had removed the children from Puerto Rico, or for that matter, from Ohio, it would necessarily follow that the Washington court lacked jurisdiction or should decline jurisdiction.

In the case of *In re Felix C.*, 116 Misc. 2d 300, 455 N.Y.S.2d 234 (N.Y. Fam. Ct. 1982), the issue was whether a Puerto Rican custody decree was entitled to recognition and enforcement in the state of New York. Puerto Rico is a "state" under both the UCCJA and the Parental Kidnaping Prevention Act of 1980 (PKPA). The father had obtained a divorce and custody of the parties' only child after the mother unilaterally removed the child to the state of New York. Although there were additional reasons for not recognizing and enforcing the Puerto Rican custody decree (the decree was obtained without actual notice and opportunity to be heard, the mother having been served by publication), the New York court noted that both the UCCJA and the PKPA speak in terms of sister-state recognition and enforcement of "child custody determinations". *Felix C.*, at 308-09. The UCCJA and the Parental Kidnaping Prevention Act of 1980 define "custody determination" in almost identical terms.[35]

> However, one must also read into the definition the statutory statement of purpose "that a determination of custody and visitation is [to be] rendered in the State which can best decide the case in the interest of the child".
> There is eminent good reason for insisting on an enlightened and expansive construction of the definition of child cus-

---

[35]*See* 28 U.S.C. § 1738A(b)(3) and RCW 26.27.020(2) (custody determination means a court decision and court orders providing for custody or visitation of a child).

tody determination. The rendering of a child custody determination constitutes one of the most delicate, challenging and ofttimes frustrating responsibilities exercised by a trial jurist. . . . The *sine qua non* of a child custody determination is that it must be based on the best interests of the child. Implicit in this precept is the necessity that the determination of best interests be made at a plenary hearing with both sides afforded an opportunity to present their case[s].

. . . .

. . . This requirement goes hand-in-hand with the best interests requirement because it is only in the course of a full and plenary hearing *on the merits* that a court can become cognizant of the individual needs of a child, and evaluate the various factors which determine best interests.

. . . .

The Puerto Rican custody decree was not based on the child's best interests, and therefore was not a "child custody determination" entitled to enforcement and recognition.

(Citations omitted. Some italics mine.) *Felix C.*, at 309-11.

In this case of Ieronimakis, by the time of the revision hearing it was apparent that although both parents were represented by attorneys in the Greek court proceedings the primary evidence being presented there had little or nothing to do with the best interests of Joseph and Nicholas but rather with the alleged blemishes on Helen and Markos and who had misled whom as to his and her respective character at the time of the marriage.[36] This is not the kind of evidence upon which to base a decision *on the merits* as to child custody as contemplated by the act.

There is no indication from the translations of the Greek court documents contained in the record on appeal that a guardian ad litem had been appointed in Greece to speak for the children or that the wishes of the children were even considered relevant in these proceedings.

It is inherent in the purposes of the UCCJA that the state which can *best* determine the best interest of a child be the state which makes the custody determination. *Ordinarily*, that will be the state with which the child and

---

[36]Helen did not personally appear at the trial in Greece. Markos had caused criminal charges to be instituted against Helen in Greece. She was subject to arrest if she were to have appeared for the trial in Greece. The basis for the criminal charges is unclear from the record for this appeal.

his family have the closest connection and where significant evidence concerning the child's care, protection, training and personal relationships is most readily available. RCW 26.27.010(1)(c). This presupposes however that the significant evidence will in fact be presented in that state. If it will not be presented, the reason for the "home state preference" does not exist, whether that "home state" be one of the 50 states of the United States, or the District of Columbia, or the Commonwealth of Puerto Rico, or Greece.[37]

In the case of *E.E.B. v. D.A.*, 89 N.J. 595, 446 A.2d 871 (1982), *cert. denied sub nom. Angle v. Bowen*, 459 U.S. 1210, 75 L. Ed. 2d 445, 103 S. Ct. 1203 (1983), the New Jersey court concluded that

> [the] UCCJA does not contemplate blind obedience to home state jurisdiction. The state to decide a child custody dispute is not necessarily the home state, but the one best positioned to make the decision based on the best interest of the child. Often the home state will also be the state with the most significant contacts with the child. [The] UCCJA, however, rejects a rigid rule vesting jurisdiction automatically in the home state and favors, instead, a more flexible approach.
>
> . . . .
>
> A custody dispute is more than a jurisdictional chess game in which winning depends on compliance with predetermined rules of play. A child is not a pawn. In exercising its discretion within the confines of UCCJA and PKPA, a court should consider not only the literal wording of the statutes but their purpose: to define and stabilize the right to custody in the best interest of the child.

(Citations omitted.) *E.E.B.*, at 610-11. I agree. In the case of *E.E.B.*, Ohio, the home state of the child in question, had made a "custody determination" without holding a best interest hearing. Despite requests, the Ohio court declined

---

[37]*Cf. Wolf v. Boeing Co.*, 61 Wn. App. 316, 810 P.2d 943, *review denied*, 117 Wn.2d 1020 (1991). One of the factors to be considered in making a forum non conveniens determination is whether the substantive law of the foreign forum is "adequate", *i.e.*, whether basic justice can be obtained in that forum.

The substantive law of the foreign forum is presumed adequate unless the plaintiff makes some showing to the contrary, or unless conditions . . . otherwise known to the court, plainly demonstrate that the plaintiffs are highly unlikely to obtain basic justice therein.

61 Wn. App. at 323. "Basic justice" under the UCCJA requires a plenary hearing *on the merits*, *i.e.*, a determination based on the child's best interest.

to reopen its decree to grant a best interest hearing or to entertain any modification of that decree. Although the New Jersey court considered the Ohio decree to be a "custody determination", *cf. Felix C.*, at 300, the court decided that the Ohio decree was subject to modification in New Jersey under the PKPA and the section of New Jersey's UCCJA which is equivalent to Washington's RCW 26.27.140(1), Ohio having "declined jurisdiction" by declining to reopen or modify its decree. *E.E.B.*, at 606, 612. An equally compelling argument can be made that a decree which is not based on the best interest of the child is not a "custody determination". Further, where the issue is which of two competing states should make the initial custody determination, if there will be no "best interest" determination in the home state, that state may be deemed to have declined jurisdiction under the act.

In the case of *Etter v. Etter*, 43 Md. App. 395, 405 A.2d 760 (1979), the Maryland Court of Special Appeals determined that the Maryland trial court had properly exercised its "best interest jurisdiction" although Delaware was the home state. In *Etter*, the mother, after several years of marital strife, departed from the family home in Delaware, leaving behind Mr. Etter and the parties' 12-year-old son Troy. A year later Troy called his mother and pleaded with her to come and get him and take him to reside with her in Maryland. The mother did so, without prior notice to the father, based on allegations by Troy that he was being abused by his father. Both parents promptly commenced custody proceedings in his and her respective state of residence. The father's petition was filed first but by then the mother had already obtained an ex parte order for temporary custody which was dated on a Friday, but which was filed, along with her custody petition, on the following Monday (her petition had been presented and her order had been signed after the clerk's office had closed for the weekend). Based on the seemingly erroneous conclusion that the mother's petition had been "filed" first,[38] the Delaware court

---

[38]*See* RCW 26.27.060(1).

stayed its proceeding and the matter proceeded in Maryland. The mother was awarded custody of Troy. The father appealed, challenging Maryland's subject matter jurisdiction and arguing that, if there were subject matter jurisdiction, the Maryland court should have declined, in favor of the home state jurisdiction of Delaware.

The Maryland court determined that there was best interest subject matter jurisdiction, in that Troy and his mother had significant connections with the state and there was substantial evidence in Maryland as to Troy's present and future care, protection, training and personal relationships.

With respect to the doctrine of clean hands (RCW 26.27-.080), the court stated:

> [T]his does not appear to be the typical case of a parent unilaterally removing a child from one state to another. *In this case Troy was not snatched by a parent. He initiated the call for help to his mother to escape what now can be readily perceived as an intolerable situation.*

*Etter*, at 401.

With respect to forum non conveniens (RCW 26.27.070), although the court agreed that Delaware was definitely the home state, that did not end the inquiry. Rather, the Maryland trial court carefully weighed and considered the appropriate statutory factors, which is exactly what it was supposed to do, and there was, therefore, no abuse of discretion. *Etter*, at 404-05.

With this background, I now turn specifically to the doctrines of clean hands and forum non conveniens in this matter of Ieronimakis.

### DOCTRINE OF CLEAN HANDS

RCW 26.27.080 provides in relevant part that:

> (1) If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in similar reprehensible conduct the court *may* decline to exercise jurisdiction for purposes of adjudication of custody if this is just and proper under the circumstances.

(Italics mine.)

118

I first note that this section relates to the court's discretionary determinations. So long as the trial court exercised its discretion based on tenable grounds and for tenable reasons, this appellate court has no business substituting its judgment for that of the trial court, even if we, on the same evidence, may have decided the issue differently.[39]

Here, Helen's hands may not have been absolutely spotless, but they were far from "unclean", given the substantial evidence of physical abuse of Helen and the children by Markos, not to mention the substantial evidence of alcohol abuse by Markos. Had Helen *not* removed the children from Greece when she finally had taken all the abuse that she personally found tolerable, she perhaps would have been criticized for removing herself from the family home, while abandoning her children. Instead, she is criticized by the majority for removing the children in violation of Markos' rights. Majority opinion, at 95-96. I point out that Markos has no right to abuse his children, and no right to abuse Helen, at least not under Washington law.[40] The majority does not find the abuse suffered by Helen and the children to be "overwhelming". Majority opinion, at 93. Helen did find the abuse to be "overwhelming". So did young Joseph, who spontaneously burst into tears when asked if he would like to live with his father. Nicholas was more circumspect, but he, too, verified that he had been physically abused and he expressed concern for his own safety, if ever he should be required to visit his father in Greece, let alone reside there permanently.

I know well that my colleagues on this panel ordinarily are sensitive to the needs of women and children. In this instance, however, I believe the majority has fallen into the

---

[39]Although the determinations as to jurisdiction and whether to exercise or decline to exercise jurisdiction were primarily based upon affidavits and written reports, the Superior Court had the benefit of at least two hearings at which all parties were present and the trial court heard directly from the guardian ad litem at the time of the revision hearing. This court has not had that benefit.

[40]There is no evidence in the record for this appeal as to Greek law on these subjects.

trap of basing its decision, at least in part, on the precon-
ceived notion that because the violence in this family was
not "overwhelming" (in the eyes of the majority), it was not
a proper basis for Helen's decision to remove the children
from Greece and flee to Washington. *But see* Washington
Task Force on Gender and Justice in the Courts, *Gender &
Justice in the Courts* 18 (1989):

> **b. GENDER-BIASED BELIEFS AND MYTHS**
> Societal attitudes towards the problem of domestic violence
> have long reflected gender bias. Some of these gender-biased
> beliefs (and responses to them) have been identified by the
> National Institute of Justice and are described here as "myths"
> about domestic violence.
> 1) *The belief that domestic violence is a private "family mat-
> ter"*. The belief that the sanctity of the family is more impor-
> tant than addressing the violent, often criminal, behavior is
> false. A man has no right under existing law to beat his wife.
> This type of behavior constitutes a crime.
> 2) *The belief that domestic violence is usually precipitated by
> the victims['] provocations*. This myth stems from a belief that,
> on some level, men still have the right to chastise their wives
> for behavior that men do not like.
> 3) *The belief that she must like it or she would leave*. Battered
> women face enormous pressures to remain in an abusive rela-
> tionship including economic dependency, fear of increased vio-
> lence, pressure to "keep the family together" from the church,
> family, and friends. This myth denies the role the larger society
> plays in maintaining the violent relationship and not giving
> the batterer a consistent message that the violent behavior is
> unacceptable. These gender-biased beliefs and myths are still
> operating in the judicial system's handling of domestic violence.

(Footnote omitted.)

I find no requirement in the law that Helen should have
waited to remove the children from Greece until the physi-
cal abuse became "overwhelming" not only to her but also
to the majority of this court. Certainly the physical abuse
described by Helen and the children did not rise to the
level of felony assault. Nevertheless, domestic violence
tends to escalate. Helen overcame enormous cultural pres-
sures to remain in an abusive relationship. She left because
she did not "like it", for herself or for her children. She
should be commended and not chastised.

Under RCW 26.27.080 a "wrongful" removal is the equivalent of "reprehensible conduct". Helen's conduct did not rise to the level of "reprehensible". Even if it had, the determination to decline to exercise jurisdiction on that basis is discretionary and must be "just and proper under the circumstances." RCW 26.27.080(1).

Our Supreme Court had occasion to discuss the clean hands doctrine under similar circumstances to those present in this case, in the case of *In re Marriage of Verbin*, 92 Wn.2d 171, 595 P.2d 905 (1979). *Verbin* was decided after Washington adopted the UCCJA, and although the uniform act was not in effect at the time of the trial, so that the Supreme Court did not base its decision on the act, the Supreme Court specifically noted that its decision would be no different if the UCCJA had been in effect at the time of the trial. *Verbin*, 92 Wn.2d at 178 n.1.

In *Verbin*, the parties had lived in Maryland with their two children for 5 years. After a period of serious marital discord the mother, without telling the father of her intentions, took the children and came to Washington to live near her parents, brother and sister, all of whom resided here. The mother had become concerned that the parties' unhappy marital relationship would adversely affect the children.

Several weeks later the father came to Washington, found the children playing outdoors, and took them back to Maryland, without notifying the mother.

A week later, the mother returned to Maryland in an attempt to find both children and bring them back to Washington. She was successful in locating one child but not the other. Fearing that the father would stop her if she waited any longer, the mother then left with the one child and returned to Washington, where she commenced marital dissolution proceedings. She sought custody of both children.

The father appeared promptly in the Washington proceedings and at first he made no effort to contest jurisdiction. Later, after receiving an unfavorable family court investiga-

tion report the father did challenge jurisdiction, arguing unclean hands and forum non conveniens.[41]

Under Washington law prior to the adoption of the UCCJA, a parent who brought a child into Washington in violation of a valid custody decree could not establish a lawful domicile for the child in Washington. The Washington "clean hands" doctrine was thus based on domicile of the child and was mandatory. *Verbin*, 92 Wn.2d at 179. After the adoption of the UCCJA, removal of a child to Washington may be "wrongful" whether or not in violation of a valid custody decree, but the trial court may nevertheless exercise its discretion to retain jurisdiction. *Verbin*, 92 Wn.2d at 179.

In *Verbin*, the mother brought the children to Washington at a time when she was lawfully entitled to do so and so there was no violation of the then-mandatory clean hands doctrine. Because the UCCJA had, by the time of the *Verbin* decision, been adopted in Washington, the Supreme Court also addressed the provisions of § 8 of the uniform act, *i.e.*, RCW 26.27.080(1):

> We note, however, that even under section 8 of the Uniform Act our court would not have been required to decline jurisdiction. Section 8 contemplates consideration of all relevant facts and circumstances, and the exercise of discretion by the trial court to determine what is "just and proper under the circumstances." In this case [the mother] justifiably feared for the emotional well-being of her children as well as her own physical and emotional safety, if they stayed in the Maryland home. She fled to the comfort of her own parents and siblings, who were also able to extend security and love to her children. The trial court, in the exercise of its discretion, could well have found her conduct was not wrongful and did not require it to decline jurisdiction under the Uniform Act.

*Verbin*, 92 Wn.2d at 180.

---

[41]In the meantime, the father had commenced divorce proceedings in Maryland. Maryland had adopted the UCCJA. The father filed a false affidavit in Maryland in which he claimed there was no other custody proceeding pending. In the Maryland decree the father was awarded custody of both children. In the Washington proceeding the mother eventually was awarded custody of the child she had been able to locate and bring back to Washington. The father was awarded custody of the other child. The father appealed. The Washington Supreme Court granted direct review.

Although dicta, the Supreme Court's analysis was intended to provide guidance to the courts of this state in view of the then-recent enactment of the UCCJA. The Supreme Court's analysis should govern this appeal. In this case of Ieronimakis, the issue is directly before us and should be decided in Helen's favor. I find no abuse of discretion in the trial court's decision to retain jurisdiction under RCW 26.27-.080(1).

## FORUM NON CONVENIENS

RCW 26.27.070 contains a *nonexclusive* list of factors to be considered by a trial court in making its *discretionary* determination of whether to exercise jurisdiction or to defer to another more convenient forum.[42] I find no abuse of discretion in the trial court's decision to retain jurisdiction under RCW 26.27.070 because, although Greece was the home state and certainly had had a closer connection with Markos and the children, the whole focus of the custody proceedings in Greece was directed *not* at the best interests of Joseph and Nicholas but at the shortcomings of Helen and Markos. Further, the children and Helen clearly had a significant connection with Washington and there was substantial evidence available in Washington as to the children's past, present and future care, protection, training and personal relationships. The Washington court stood ready to address the best interests of the children. It was in the best interests of these children for Washington to exercise its best interest jurisdiction because the *overriding* purpose of the act is that

---

[42]The nonexclusive list of factors is found at RCW 26.27.070(3):

"(a) If another state is or recently was the child's home state;

"(b) If another state has a closer connection with the child and his family or with the child and one or more of the contestants;

"(c) If substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state;

"(d) If the parties have agreed on another forum which is no less appropriate; and

"(e) If the exercise of jurisdiction by a court of this state would contravene any of the purposes stated in RCW 26.27.010."

the custody determination be made in the jurisdiction which can *best* determine the best interests of the children. Regardless of any other factor, this simply requires that the attention of the deciding court be focused upon the *needs of the children.* While we must not fall into the trap of a "cultural superiority" mindset in these matters, we cannot ignore the simple fact that be it Greece or Puerto Rico or Ohio, if no "best interest hearing" will take place in the home state, and if there is "best interest jurisdiction" in Washington, it is the duty of the Washington courts to exercise that jurisdiction.

Again, I find support for this conclusion in *Verbin*. There the Supreme Court concluded, under circumstances which are very similar to the present appeal, that it *would have been an abuse of discretion for the trial court to have declined to exercise jurisdiction.* In *Verbin*, not only were the Washington proceedings the first to be commenced, but also the important witnesses relating to the child's welfare were in Washington — her teacher, the family court investigator, the child's psychiatrist, her friends and relatives — were in this state.[43] Although some of the same evidence probably could have been presented in Maryland (the Washington family court investigation report, for example), *in fact the Maryland court had never been presented with that evidence and the Maryland court had conducted no investigation of its own.* Finally, by vigorously participating in the Washington proceedings the father had demonstrated his financial ability to litigate in Washington. By way of contrast, the mother had very limited financial means (and although she was represented by a lawyer in Maryland she could not afford to personally attend the trial in that state). *Verbin,* 92 Wn.2d at 180-81. Under the very similar circumstances of Ieronimakis, it was not an abuse of discretion for the trial court to retain jurisdiction under the doctrine of forum non

---

[43]Notably, most of this important evidence had been developed after the mother removed the child to Washington. See discussion, *supra*, re: best interest subject matter jurisdiction.

conveniens, and, in fact, had the revision judge ruled otherwise, given all the circumstances of this case, and based upon *Verbin*, I would vote to reverse.

## HAGUE CONVENTION

I agree with the majority that the Hague Convention does not control this appeal, in that Greece has not ratified the convention. I disagree that the majority decision is consistent with the purposes and provisions of the Hague Convention. Helen's removal of the children was not "wrongful". Further, even if a child has been "wrongfully" removed, article 16 of the Hague Convention does not deprive the state where the "wrongfully" removed child is found of jurisdiction to decide the custody dispute on its merits, if the court where the child is found has determined that to return the child would expose him or her to a grave risk of psychological harm or otherwise place the child in an intolerable situation. From the evidence in this case, it is clear that to return Joseph and Nicholas to Greece would expose them to a grave risk of psychological harm or otherwise place them in an intolerable situation. Not only is there substantial evidence that the children had been physically abused by Markos, but also there was a grave risk that to return the children to Greece would be to deprive the children of their mother, perhaps for all the remainder of their childhoods. Both Dr. Reichert and Ms. Gompf concluded that this would have a disastrous psychological effect on both children.

In the proceeding below, the guardian ad litem (who is an attorney) reviewed the provisions of Greek law and the records of the Greek court proceedings which have been included with the record for this appeal. The guardian also interviewed Helen, Markos, the children, Markos' sister and numerous other individuals who are well acquainted with this family. The guardian reported to the court her concerns that if the children were to be returned to Greece there was a grave risk that Helen's contact with the children would be terminated.

Markos made no convincing effort below, nor has he in this appeal, to rebut that concern. Although at this court's last notice Helen had prevailed in Greece, at least temporarily, by virtue of her appeal, I find it significant that the decree from which she appealed provided no visitation rights to Helen.[44]

I conclude that to return the children to Greece would place them in an intolerable situation, given the history of domestic violence, given these children's close bonding with their mother and given the lack of any assurance that to return the children to Greece will not cause them to lose the companionship of their mother, perhaps for all of the remainder of their childhoods. Any such loss of their mother's companionship would irrefutably cause these children grave psychological harm. The majority has not addressed how Helen might enforce visitation rights in Greece in the absence of any decree, either here or in Greece, which grants such rights. If the Hague Convention had been in effect between Greece and the United States at the relevant time, Washington still would have had jurisdiction to proceed on the merits.

## UNDECIDED ISSUES

The majority declines to address Markos' objection to the parenting plan, but then proceeds to point to some of the provisions of the plan in defense of the majority decision as to jurisdiction.[45] Majority opinion, at 94. Nevertheless, there

---

[44]By way of contrast, the Washington decree provided Markos with visitation rights.

[45]Markos' objections to the parenting plan do not relate to jurisdiction. In fact, I question Markos' right to appeal any issues except subject matter jurisdiction, forum non conveniens and clean hands, since he specifically limited his appearance below to the issue of jurisdiction. The parenting plan was part of a *default* decree. There has been no motion to quash the order of default. Markos apparently believed that he could not preserve his jurisdiction issues if he were to litigate on the merits. This was an incorrect assumption, but nevertheless, having chosen to allow entry of a default decree, Markos may not appeal the provisions of the parenting plan without first moving to quash the order of default.

is substantial evidence to support the restrictions upon Markos' visitation in Seattle.[46] Those restrictions are in accord with the recommendations of the guardian ad litem, who had personally interviewed Markos and numerous other individuals who know Markos well, and who was concerned that there be no opportunity for Markos to return the children to Greece in violation of the parenting plan. These are sensible precautions. If temporarily giving up one's passport places one in the same category as a "criminal on bail", majority opinion, at 94, then Markos, at least, is no worse off than are tourists in many countries in Europe who commonly are required to leave their passports with the desk clerk at their hotels, until the time of their departure. In some countries a visitor must leave his or her passport with the customs officials until he or she leaves the country. Not only is this no great hardship, but also, by the terms of the parenting plan, if the children wish, they may visit Markos in Greece, without supervision, when Joseph is 14 and Nicholas is 13, so long as Markos gives assurances that the children will be returned.[47]

CONCLUSION

I would affirm the Superior Court's jurisdictional rulings and the provisions of the parenting plan. I would reverse only the ruling as to the imposition of a share of the fees of the guardian ad litem and the evaluating pediatrician against Markos, since the Superior Court expressly found it had no personal jurisdiction over Markos. The remainder of Markos' assertions are without merit.

Review denied at 120 Wn.2d 1006 (1992).

---

[46]See RCW 26.09.191.

[47]Compare this with the ruling of the Greek trial court, which awarded Helen no visitation rights whatsoever. If Markos were eventually to prevail in the Greek appellate courts, that same decree would be reinstated.